DRUG PACKAGE, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Graphic Arts International Union, Local 505, AFL–CIO–CLC, Intervenor-Respondent.

No. 77–1149.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1977.

Decided Feb. 13, 1978.

---

D. J. Sullivan of Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for petitioner; Michael J. Tannler and Timothy L. Stalnaker, St. Louis, Mo., on the brief.

Joseph A. Oertel, Atty., N. L. R. B., Washington, D. C., for respondent; William R. Stewart, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on the brief.

Charles A. Werner of Schuchat, Cook & Werner, St. Louis, Mo., for intervenor-respondent; A. John DeVouton, St. Louis, Mo., on the brief.

Before BRIGHT and ROSS, Circuit Judges, and HARPER, Senior District Judge.*

BRIGHT, Circuit Judge.

Drug Package, Inc. (the Company), petitions this court to set aside an order by the National Labor Relations Board requiring the Company to recognize and bargain with Local 505, Graphic Arts International Union, AFL–CIO–CLC (the Union), and to reinstate employees who went on strike. The Board and the Union cross-petition for enforcement of the order. We grant enforcement in part, deny enforcement in part, and remand to the Board for further consideration.

---

\* ROY W. HARPER, United States Senior District Judge, Eastern District of Missouri, sitting by designation.

1. The Board's policy is to hold representation petitions in abeyance when a party has filed an unfair labor practice charge based on conduct that would tend to interfere with a free elec-

In 1974 the Union began a campaign to organize the production and maintenance department employees of Drug Package, Inc., a specialty printing company located in O'Fallon, Missouri. By May tenth of that year, a majority of the 182 employees in the bargaining unit had signed cards authorizing the Union to act as their collective bargaining agent. The Union informed the Company of its majority support, but the Company refused to recognize or bargain with the Union. On May 23, the employees voted to strike, and the following day eighty-two of the employees went out on strike. Although the Union had filed a representation petition with the Board, the hearing on the petition was postponed indefinitely by the Company's filing of unfair labor practice charges on May 28 and the Union's filing of cross-charges on May 31 and July 31.[1]

The present proceedings arise out of the Union's charges that the Company had violated sections 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (5)(1970). Prior to the issuance of the complaint, the Board's St. Louis regional director dropped the 8(a)(5) charge and the Board's general counsel sustained that ruling on appeal. At a subsequent hearing on the complaint, an administrative law judge found that the Company had violated sections 8(a)(1) and 8(a)(3) and recommended that the Board issue a bargaining order requiring that the Company bargain with the Union on demand. He further found that the strike was not an unfair labor practice strike and, therefore, the striking employees were not entitled to reinstatement. All parties filed exceptions to the decision.

The Board, in a decision issued February 10, 1977, 228 NLRB No. 17, 94 LRRM 1570, found that the Company had violated sec-

---

tion, unless the party filing the charge requests the Board to proceed with the election. *NLRB Casehandling Manual—Representation Proceedings* ¶ 11730.4(a) (Oct.1975). In the present case the Company filed the initial charge; thus, an election cannot be conducted unless the Company so requests or the Board disposes of the Company's charge.

tion 8(a)(1) by interfering with, restraining, and coercing employees in the exercise of their section 7 rights, and that the Company, by refusing to bargain with the Union on or after May 10, 1974, had violated section 8(a)(5). The Board ordered the Company to bargain with the Union, but made the bargaining obligation retroactive to May 10, 1974. Reversing the administrative law judge's conclusion as to the nature of the strike, the Board found that the strike was caused by the Company's 8(a)(5) violation and, therefore, was an unfair labor practice strike. The Board ordered the strikers to be reinstated upon application and ordered that the Company be liable for backpay for any strikers not reinstated. The Board also concluded that the Company had not violated section 8(a)(3).

The case comes before us on the Company's petition to review and set aside the Board's order and the Board's cross-petition for enforcement. The Union, as intervenor, joins the Board in seeking enforcement. The Company does not challenge the findings of 8(a)(1) violations, but it challenges the following determinations: (1) that the 8(a)(1) violations were serious enough to warrant a bargaining order; (2) that the Company violated section 8(a)(5); (3) that a retroactive bargaining order is appropriate; and (4) that the strike was an unfair labor practice strike.

### I. The 8(a)(1) Violations.

The Board found the Company guilty of approximately seventeen violations of section 8(a)(1) by interfering with the employees' organizational rights. These violations rested on comments made by the Company's supervisory and managerial personnel during conversations with several employees. In these conversations, the supervisors stated that if the plant were unionized some employees, particularly those with physical disabilities, might be fired, that the employees would have to work harder, that certain fringe benefits, including a company-run bus service from St. Louis to the plant site, would be discontinued, that the Company would have to fire a certain number of employees in order to hire a quota of black employees, and that the Company might have to close down. Approximately nine of these conversations occurred prior to May 10, the date on which the Union obtained organizational cards from a majority of the employees; three of these conversations occurred on May 10; and four of the conversations occurred between May 10 and the employees' strike on May 24. The final unfair labor practice occurred on May 30, when a production supervisor suggested that an employee ought to tear up her union card, or she might be fired.

■ The usual remedy for unfair labor practices of this sort is a cease and desist order followed by an election. The courts and the Board have recognized, however, that some unfair labor practices are so serious that they completely destroy the possibility of conducting a fair election. When the employer's misconduct has dissipated the union's majority support, a bargaining order is the appropriate remedy, for it both acknowledges the majority support of the union prior to the violations and prevents the employer from benefiting from its own misconduct. See NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); Steel-Fab, Inc., 212 NLRB No. 25, 86 LRRM 1474 (1974); Trading Port, Inc., 219 NLRB No. 76, 89 LRRM 1565 (1975).

■ The question presented here is whether the Company's conduct in this case so seriously impeded the election process and undermined the strength of the Union that a bargaining order is an appropriate remedy.

Both the administrative law judge and the Board concluded that the 8(a)(1) violations seriously interfered with the possibility of a fair election. The administrative law judge found that the 8(a)(1) violations were

extensive and pervasive and that the "possibility of erasing the effects of [such] past practices and of insuring a fair election by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order."

The Board agreed:

We conclude that these threats and actions of Respondent's agents described above may, of course, be presumed to have had a severe initial impact on the employees. We also conclude that the actions may be presumed to have had an impact that has destroyed the likelihood that a true picture of employee sentiment may now be obtained through the election process. * * *

Thus we find that Respondent's actions have rendered a fair election a slight possibility at best and that the unambiguous cards validly executed by a majority of the employees in the unit represent a more reliable measure of employee desires on the issue of representation than would an election and that the policies of the Act will be best effectuated by the entering of a bargaining order at the present time. [228 NLRB at ——, 94 LRRM at 1575.]

The Company does not dispute the finding that these conversations constituted unfair labor practices, but it contends that these conversations produced minimal impact and did not preclude a fair election. The Company characterizes the conversations as mere chit-chat among supervisors and employees who were friends and co-workers. It points out that the supervisors directed their comments to only a few of the 182 employees in the bargaining unit, that many of those employees were ardent union supporters who later went on strike, and that almost half the employees demonstrated their support for the Union by participating in the strike on May 24. These facts, the Company argues, demonstrate that the unfair labor practices produced no impact upon the loyalties of the employees to the Union.

The Board and the Union, on the other hand, argue that the evidence supports the Board's determination that the unfair labor practices did erode the employees' support for the Union. They suggest that the close relationship between the employees and the supervisors gave added credibility to the supervisors' statements, thereby increasing the anti-union impact of their comments. The Board and Union further suggest that, because of the tendency of information and rumors to travel rapidly through a small plant, the comments in question likely affected more than the small number of employees directly involved in the conversation. Finally, the record shows that fewer than half the employees participated in the strike, whereas a majority had earlier signed authorization cards; the Board and Union argue that this evidence demonstrates that the Company's conduct intimidated some employees.

We conclude that the record is largely silent on the actual impact of the Company's unfair labor practices upon the employees' support for the Union. In *Arbie Mineral Feed Co. v. NLRB*, 438 F.2d 940 (8th Cir. 1971), we held that in such a case we should defer to the Board's exercise of discretion and grant enforcement. In *Arbie*, we established the following guidelines for determining whether a bargaining order should be enforced:

(1) Where the underlying facts affirmatively show that the unfair labor practices have in fact undermined a union majority, * * * we grant enforcement;

(2) Where the record is silent concerning the actual impact of the employer's unfair labor practices, we defer to the Board's exercise of discretion and grant enforcement; and

(3) Where the evidence establishes that the unfair labor practices produced little or no impact upon the employees' allegiance to the union, we deny enforcement. [*Id.* at 945.]

The present case falls into the second category.[2] Accordingly, we grant enforcement of the bargaining order, modified as directed below.

## II. *The 8(a)(5) Violation.*

We find that the Board erred in concluding that the Company violated section 8(a)(5) by refusing to recognize and bargain with the Union on or after May 10, 1974. This conclusion rests on two grounds.

First, the 8(a)(5) charge was not fully and fairly litigated. Although the Union's charge against the Company, filed in May of 1974, alleged an 8(a)(5) violation, the Board's regional director dismissed that charge and the Board's general counsel upheld the dismissal. Neither the complaint filed by the regional director on October 16, 1974, nor the amendments filed on November 12, 1974, contains an allegation of a section 8(a)(5) violation. The administrative law judge made no finding of a section 8(a)(5) violation and the exceptions to the administrative law judge's decision filed by the Union as the charging party did not press a claim for an 8(a)(5) violation.

Nevertheless, the Board concluded that the Union had been the exclusive representative of the employees in the bargaining unit since May 10, 1974, and that the employer had violated section 8(a)(5) of the Act by refusing to bargain with the Union on and after May 10, 1974. Although the Board recognized that the complaint did not allege the refusal to bargain as an independent violation of the Act, it concluded that the facts necessary to find a section 8(a)(5) violation had in fact been litigated in the context of the 8(a)(1) charge. Therefore, the Board deemed it appropriate that it find the Company in violation of section 8(a)(5). 228 NLRB at ——, 94 LRRM at 1576 n. 21.

We have recognized the Board's power to decide an issue that has been fairly and fully tried by the parties, despite the fact that the issue was not specifically pleaded. *See American Boiler Manufacturers Association v. NLRB,* 366 F.2d 815, 821 (8th Cir. 1966). However, under the facts in this case we do not believe that the 8(a)(5) issue was fairly litigated. The most serious remedies imposed in this matter—the retroactive bargaining order, the reinstatement of the strikers, and the backpay liability—rest upon the Board's finding of an 8(a)(5) violation. Although the underlying facts were litigated, the Company, at the time of the hearing, was aware only of the possibility that the Board would find an 8(a)(1) violation and order a prospective bargaining order as relief.[3] Had the Company been given notice of the possibility of an 8(a)(5) violation and the resulting additional penalties, it might have litigated the matter differently.

Second, the Board's finding of an 8(a)(5) violation rested on the assumption that an obligation to bargain existed on May 10, 1974.[4] That "bargaining obligation," however, is merely a legal fiction

---

**2.** *See also NLRB v. Gissel Packing Co., Inc.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), in which the Supreme Court approved the Board's use of the bargaining order in "less extraordinary cases marked by less pervasive [unfair labor] practices which nonetheless still have the *tendency* to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. at 1940 (emphasis added).

**3.** The hearing was conducted prior to the Board's decision in *Trading Port.* Thus, a prospective bargaining order was the most severe penalty available at that time for an 8(a)(1) violation. *See* section III *infra.*

**4.** The Board reasoned as follows:

[W]e find that the policies of the Act require that Respondent be ordered to bargain with the Union as the exclusive representative of its employees based on the authorization cards. We further find that Respondent's bargaining obligation began on May 10, 1974, the date the record first establishes that the Union secured a majority in the unit in the context of Respondent's contemporaneous course of unlawful conduct. Respondent was therefore dutybound to bargain with the Union as of that date.[21]

[21] We further find that Respondent's refusal to bargain on and after May 10, 1974, violated Sec. 8(a)(5) and (1) of the Act.

[228 NLRB at ——, 94 LRRM at 1576.]

enabling the Board, through hindsight, to create what it considers to be a full and complete remedy in the form of a retroactive bargaining order. An employer, in fact, is not under an obligation to recognize a union merely on the showing of majority support, for the employer has the right to insist on an election. *NLRB v. Gissel Packing Co., Inc., supra,* 395 U.S. at 600, 89 S.Ct. at 1933. The refusal to bargain becomes unlawful only when the employer engages "in contemporaneous unfair labor practices likely to destroy the union's majority and seriously impede the election." *Id.* In the present case, the Company was under no legally-established obligation to bargain on May 10, 1974, when, in the Board's words from a prior case, "there was no way for anyone, including the Employer, the Union, or the employees, to have known that a bargaining obligation existed." *Steel-Fab, Inc., supra,* 212 NLRB at 363, 86 LRRM at 1476. The Company had no way of knowing that it had an obligation to bargain until the administrative litigation had been completed. Because no legally-established obligation to bargain existed on May 10, 1974, the Company did not commit an 8(a)(5) violation by refusing to bargain on that date.

## III. *Retroactive Bargaining Order.*

We conclude that a retroactive bargaining order is inappropriate in this case.

The Board first adopted a policy of making bargaining orders effective retroactively in *Trading Port, Inc.,* 219 NLRB No. 76, 89 LRRM 1565 (1975). In doing so, it expressly reversed the position, announced a year earlier in *Steel-Fab, Inc.,* 212 NLRB No. 25, 86 LRRM 1474 (1974), that bargaining orders cannot be retroactive. In *Trading Port,* the Board reasoned that a prospective bargaining order failed to provide a complete remedy for the employer's unlawful conduct:

> In some instances, this left unremedied an employer's unilateral changes in working conditions made after a union had established its majority status. * * * [Thus] the Board's prospective bargaining order fell short of reinstating the situation as it would have been had [the employer] obeyed the law and allowed a fair election to proceed. [219 NLRB at 301, 89 LRRM at 1569.]

An 8(a)(5) violation is a prerequisite to a retroactive bargaining order under the *Trading Port* doctrine. Only if an earlier duty to bargain existed and was violated may the Board impose a bargaining order retroactively.

We hold that the *Trading Port* doctrine should not be applied in the present case. Our conclusion rests on two grounds.

First, we have already rejected the Board's finding of an 8(a)(5) violation, which is a prerequisite for a retroactive bargaining order under *Trading Port.*

Second, the Board's retroactive application of *Trading Port* in the present case was unfair to the Company.[5] Both the hearing and crucial actions by the parties occurred prior to the Board's decision in *Trading Port.* On February 26, 1975, five

---

5. The efficacy and justice of the Board's retroactively changing the law through its adjudicatory rather than its rule-making powers have been examined in detail by the courts and commentators. *See, e. g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *NLRB v. Majestic Weaving Co.,* 355 F.2d 854, 860–61 (2d Cir. 1966); *NLRB v. A. P. W. Products Co.,* 316 F.2d 899 (2d Cir. 1963); *NLRB v. International Bhd. of Teamsters,* 225 F.2d 343 (8th Cir. 1955); K. Davis, *Administrative Law Treatise* § 17.08 (Supp. 1970). We entertain no doubt now that the Board does have the power to announce new principles of law in an adjudicatory proceeding. *See NLRB v. Bell Aerospace Co., supra,* 416 U.S. at 294, 94 S.Ct. 1757. In deciding whether to exercise that power, however, the Board must weigh the benefits to be achieved by the new interpretation of the law against the detrimental effects of retroactive application of the new rule. *NLRB v. Bell Aerospace Co., supra; SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *NLRB v. Majestic Weaving Co., supra; NLRB v. A. P. W. Products Co., supra.*

months before *Trading Port,* the Union offered to withdraw the picket line and return the strikers to work on the condition that the strikers be reinstated. The Company, having hired replacements, rejected the offer. In doing so, the Company relied on *Steel-Fab* as assurance that even if the Board ultimately issued a bargaining order, the order would operate prospectively only.[6] The Board, however, applied the new *Trading Port* doctrine when it reached its decision two years later. The Board looked for and found both a prior duty to bargain and an 8(a)(5) violation; then, on the basis of the 8(a)(5) violation, it characterized the strike as an unfair labor practice strike. *See* section IV *infra.* Thus, the retroactive application of *Trading Port* resulted not only in a retroactive bargaining order, but also in an order to reinstate the strikers, whom the Board considered to be unfair labor practice strikers, and substantial backpay liability. It would be fair to assume that the Company, had it known of the possibility of these penalties, might have given the Union's offer greater consideration. At the time of the offer, however, the Company had no way of knowing that the Board would soon change its approach to these issues.

■ The Company relied on the Board's earlier decisions in taking this crucial action. To apply *Trading Port* retroactively in this case would be detrimental to the Company, while accomplishing none of the benefits contemplated in *Trading Port.*

We therefore conclude that the Board should have considered this case under the principles of *Steel-Fab,* not those of *Trading Port,* and that a retroactive bargaining order is improper.

## IV. The Nature of the Strike.

■ We conclude that the strike was not an unfair labor practice strike.

The record shows that employees voted to strike at a meeting held on May 23, 1974. During the meeting the employees discussed the Company's conduct and efforts to undermine the status of the Union, but the express purpose of the strike vote, according to the testimony of Marvin Mantei, executive vice president of the Union, was "for recognition and a contract." When the strike began the following day, the picket signs stated: "Employees of Drug Package on Strike for Recognition and Contract." On May 29, the Union attorneys notified Mantei that the strike had changed to an unfair labor practice strike. Mantei had new picket signs printed and distributed to the strikers. The new signs read: "Employees of Drug Package, Inc. on Unfair Labor Practice Strike."

The administrative law judge found that the strike was not an unfair labor practice strike on May 24 nor converted to one on May 29:

**6.** The employer's reliance on the Board's past decisions is one factor that should be considered in determining whether the benefits of retroactive application of a new rule outweigh the detriment. The Supreme Court expressly recognized this principle in *NLRB v. Bell Aerospace Co., supra,* although it found the employer's reliance insignificant in that case. The question in *Bell* was whether buyers in the company's purchasing department were "managerial employees." The Court stated:

> The possible reliance of industry on the Board's past decisions with respect to buyers does not require a different result. It has not been shown that the adverse consequences ensuing from such reliance are so substantial that the Board should be precluded from reconsidering the issue in an adjudicative proceeding. Furthermore, this is not a case in

which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on Board pronouncements. Nor are fines or damages involved here. In any event, concern about such consequences is largely speculative, for the Board has not yet finally determined whether these buyers are "managerial." [416 U.S. at 295, 94 S.Ct. at 1772.]

In this case, these concerns of the Supreme Court are present. The adverse consequences flowing from the Company's reliance on *Steel-Fab* are substantial. New liability is being imposed. Finally, the Board having already reached its decision, the consequences here are real, not speculative.

Not only were the strikers not informed as to what the unfair labor practices were but neither was their employer. Patently the only definite purpose expressed for the strike, and on which the employees voted, was that it was "for recognition and a contract." Hence there is no evidence that the strikers and the employer were aware of what action by the employer caused a change in the wording of the picket signs.

Accordingly, the Company has treated the strikers as economic strikers, offering them reinstatement when openings arise.[7]

The Board disagreed with the administrative law judge. It found that the strike was an unfair labor practice strike from its inception and that the strikers were entitled to automatic reinstatement with backpay. *See Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956). The Board reasoned as follows:

> We have already found that, on May 10, i. e., before the strike, Respondent was obligated to recognize and bargain with the Union on the basis of the Union's majority showing. This obligation Respondent did not meet and the strike for recognition was clearly prompted by Respondent's failure to do so. The Board has long held that when employees strike for recognition which should have been granted at the time they went on strike and where the employer engages in contemporaneous widespread illegal conduct designed to frustrate the statutory scheme, and bargaining in particular, the striking employees are unfair labor practice strikers. Such is exactly the situation here and although the comments at the time of the strike vote related to economic demands, it was virtually impossible to resolve those demands because

of Respondent's refusal to recognize the Union. For the foregoing reasons, we conclude the strike was an unfair labor practice strike. [228 NLRB at ——, 94 LRRM at 1576 (footnotes omitted).]

The Board's conclusion is unwarranted in the present case. The Board has often found that where a refusal to bargain caused or contributed to the strike, the strike is an unfair labor practice strike. *Ploof Transfer Company, Inc.*, 201 NLRB No. 127, 82 LRRM 1354 (1973), *enforced* 485 F.2d 686 (5th Cir. 1973); *Billups Western Petroleum Company*, 169 NLRB No. 147, 67 LRRM 1323 (1968), *enforced* 416 F.2d 1333 (5th Cir. 1969); *National Furniture Manufacturing Company, Inc.*, 130 NLRB No. 72, 47 LRRM 1414 (1961). The finding of an 8(a)(5) violation is a crucial step in the Board's reasoning. We have concluded, however, that the Board erred in finding a section 8(a)(5) violation in the present case. Without that crucial element, the strike cannot be deemed an unfair labor practice strike, and the strikers are not entitled to reinstatement.[8]

## V.  *Remedy.*

We grant enforcement of the bargaining order, prospectively only. We deny retroactive enforcement. We also deny enforcement of the order to reinstate the strikers to the extent that it is based on the Board's finding that the strike was an unfair labor practice strike.

We remand the case to the Board, however, for further consideration of its order. The bargaining order could well be a hollow remedy if the employees represented by the Union are the replacements hired during the strike, not the employees who originally supported the Union. It is

---

7.  At oral argument, we were advised that approximately twenty-five employees had been reinstated.

8.  *See Pulley v. NLRB*, 395 F.2d 870 (6th Cir. 1968). There the employer's refusal to bargain led to a strike for recognition. The court found no 8(a)(5) violation and therefore concluded that the strike was not an unfair labor practice strike. The court also noted that the employees would have struck regardless of any unfair labor practice.

well established that a bargaining order can be issued even though the Union no longer has the support of the majority of the employees. *See NLRB v. Katz*, 369 U.S. 736, 748 n.16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); *NLRB v. P. Lorillard Co.*, 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942). In this case, however, the Union has lost not the support of employees, but the very employees themselves. When the Union bargains with the Company, it will be representing neither employees who now support it nor employees who earlier had selected the Union to be their bargaining agent. We leave to the Board the question whether the Company should be required to reinstate the strikers upon application, without backpay, in order to make the bargaining order a full and complete remedy.