**NATURAL GAS PIPELINE COMPANY OF AMERICA, Petitioner-Appellant,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent-Appellee.**

No. 77–1958.

United States Court of Appeals, Seventh Circuit.

Argued May 26, 1978.

Decided Jan. 5, 1979.

Rehearing Denied Feb. 13, 1979.

Paul E. Goldstein, Chicago, Ill., for petitioner-appellant.

Norman A. Pedersen, Federal Energy Regulatory Commission, Washington, D. C., for respondent-appellee.

Before FAIRCHILD and PELL, Circuit Judges, and HARPER, Senior District Judge.*

HARPER, Senior District Judge.

This is a proceeding to review two unreported orders of the Federal Power Commission (Commission) issued in Natural Gas Pipeline Company of America, Docket No. RP73–110: "Order Modifying Initial Decision", issued June 3, 1977 (R. 355–360), and "Order on Rehearing and Denying Intervention", issued on August 11, 1977 (R. 397–404), excluding from rate base treatment certain advance payments made by appellant to various producers of natural gas. The procedural history of this appeal is as follows:

On September 4, 1974, a settlement agreement governing the rates of Natural Gas Pipeline Company of America (Natural) in Docket No. RP73–110 was approved by Commission order. Articles V and XI of that settlement agreement permitted Natural to make periodic rate changes during the period the RP73–110 rates were in effect (December 1, 1973, through November 30, 1974) and to reflect in its rate changes the level of advance payments for gas made by Natural to producers. Such advance payment "tracking" filings were to become effective without suspension, but subject to refund as to advances not conforming to the relevant rulemaking orders of the Commission on advance payments.

On July 18, 1974, Natural tendered such a tracking filing to become effective September 1, 1974, which reflected among other things three advances to Burmah Oil Development, Inc. (Burmah) totalling $4,699,000.00 and one advance to Mitchell Corporation (Mitchell) of $2,000,000.00.

On October 4, 1974, the Commission issued an order setting for hearing the question of whether these advances could properly be included in Natural's rates. A hearing was held on March 17, 1975. The Initial Decision of Presiding Administrative Law Judge Benken was issued June 18, 1975. This decision allowed rate base treatment only for advances expended by the producer as of the effective date of Natural's rate change. Natural filed exceptions to the initial decision.

On June 3, 1977, the Commission issued an order that only advances expended by the producer within thirty days after the effective date of the rate change could be reflected in Natural's rate. Application of this rule had the effect of excluding from rate base treatment all but $992,000.00 of the approximately seven million dollars in advances made by Natural to the gas producers, Burmah and Mitchell.

* Senior District Judge Roy W. Harper of the Eastern and Western Districts of Missouri sitting by designation.

On July 1, 1977, Natural applied for rehearing of the June 3rd order. By order issued August 1, 1977, the Commission denied rehearing.

The court's jurisdiction of this matter is founded upon Section 19 of the Natural Gas Act, 15 U.S.C. § 717r. Section 19 provides for review of orders of the Commission by filing a petition for review in the Court of Appeals, in which the natural gas company to which the order relates is located, within sixty days after the Commission order on rehearing is issued. Natural is a natural gas company subject to the jurisdiction of the Commission having its principal place of business in Chicago, Illinois. The orders in the proceeding below related to natural gas rates charged by Natural which are subject to the Commission's jurisdiction. Natural duly applied for rehearing. The Commission's order on rehearing was issued August 1, 1977, and Natural filed its petition for review September 21, 1977, thus complying with the sixty-day requirement.

Section 19(b) of the Natural Gas Act provides that in review of Commission orders by the courts of appeals "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b) (1970).

In the *Permian Basin Area Rate Cases,* 390 U.S. 747, 791–2, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312, the Supreme Court defined the responsibilities of reviewing courts charged with the duty of applying the substantial evidence standard:

"It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risk they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors."

We begin with a brief review of the advance payment program. Beginning in 1970, in response to an increasing shortage of natural gas, the Commission published and encouraged a program of advances by interstate pipelines to producers for the purpose of exploration for, and development of additional supplies of natural gas, with the stipulation that under certain conditions the advance payments could be included in the rate base which the pipeline uses to calculate the price that consumers will be charged for the gas.

The first of the five advance payment orders, Order No. 410, was issued by the Commission on October 2, 1970, 44 F.P.C. 1142 (1970). It was followed on January 8, 1971, by Order No. 410–A, which provided interim rate base treatment for "advances by pipelines to independent producers for exploration and lease acquisition costs." 45 F.P.C. 135 (1971). The third advance payment order, No. 441, was promulgated on November 10, 1971, and it modified the two prior orders, with the effect of eliminating rate base treatment for advances made under certain circumstances. 46 F.P.C. 1178 (1971). As an example, the Commission determined that rate base treatment would be denied to all advances for exploration and lease acquisition. 46 F.P.C. at 1180. A second mandate of Order 441 was that the advance payment program was to be limited to the period ending December 31, 1972. 46 F.P.C. at 1180–81.

In March of 1972, the advance payment program received judicial endorsement in the case of *Public Service Commission for the State of New York v. F.P.C.,* 151 U.S.

App.D.C. 307, 309, 467 F.2d 361, 363 (1972). The court discussed the theory behind giving the advance payment rates base treatment:

> "The rationale behind this decision is that the advance payments will help to give the gas producers the necessary investment capital to finance the development and production needed to alleviate the gas shortage, and the pipelines will be encouraged to make such advance payments if they are allowed to include the payments in their rate base, thus virtually simultaneously shifting the cost of the advance payments to the pipelines' customers, the natural gas consumers."

While endorsing the program, the court noted the "experimental character" of the advance payment program and the Commission's having to proceed by trial and error in its implementation. *Public Service Commission for the State of New York v. F.P.C., supra.*

On December 29, 1972, Order No. 465 was issued and besides extending the advance payment program for an additional year Order No. 465 effectuated several modifications which tended to broaden the scope of the program. 48 F.P.C. 1550 (1972). Provisions allowing rate base treatment for advances in aid of exploration, and extending rate base treatment to advances by a pipeline to an affiliate, even though the affiliate obtained a working or other interest, were included in Order No. 465. 48 F.P.C. at 1554–55.

Following another series of comments, the Commission issued Order No. 499 on December 28, 1973. Inter alia, it extended the program for two additional years to the period ending December 31, 1975, and expanded rate base treatment to include Alaskan advances made under future contracts. 50 F.P.C. 2111, 2114–5 (1973). At the same time, Order No. 499 attempted to clarify the advance-expenditure time relationship. Up until Order 499, the only guidance promulgated by the Commission provided that advances would be included within the rate base "where found reasonable and appropriate." However, in Order No. 499 the Commission specifically addressed the question of when the producer must expend the advances on gas exploration and development in relation to the inclusion of the advances in the pipeline's rate base:

> "We shall not consider amounts advanced to be 'reasonable and appropriate' for inclusion in rate base where such amounts are in excess of costs for exploration, development and production incurred by the producer within a reasonable time from the date such amounts advanced are included in the pipeline's rate base."

Following the publication of Order No. 499, the advance payment program came under attack for a second time in the case of *Public Service Commission for the State of New York v. F.P.C.,* 167 U.S.App.D.C. 100, 511 F.2d 338 (1975). New York urged "that the Commission has not developed 'a proper factual predicate' to support the continuation of the advance payments program." *Id.* (167 U.S.App.D.C. at 103, 511 F.2d at 341–42). However, New York did not call for the abolition of all rate base treatment of advance payments. Rather it contended that "the present size and scope of the program cannot be sustained as a reasoned exercise of the Commission's discretion based on the record as a whole." *Id.* (167 U.S.App.D.C. at 104, 511 F.2d at 342). The court agreed with New York and found that the Commission had failed to engage in "meaningful review, analysis and evaluation" of the experience under the advance payment program. As a result the court remanded the record for further evidence and consideration by the Commission. Nevertheless, the court would not halt the program as requested by New York. Rather, they determined that the advance payment program, should continue in effect during the agency's reconsideration and evaluation of the program. The court stated:

> "It would not be in the public interest for us to exercise our judicial authority to scuttle in their entirety agency programs which may have certain aspects that provide a beneficent impact on the gas sup-

ply." *Id.* (167 U.S.App.D.C. at 117, 511 F.2d at 355).

Turning to the present case, the agreements establishing the advance payments were entered into on June 1, 1974 (the agreement with Mitchell), and on July 2, 1974 (the agreement with Burmah). Since Order No. 499 was promulgated on December 28, 1973, the rate base treatment of the advances in question was governed by Order No. 499. This court perceives the question on appeal to be whether the Commission can retroactively modify Order No. 499, with the effect of excluding from rate treatment the advances made by appellant to Mitchell and Burmah.

 As a general policy, administrative agency orders which operate retroactively demand careful scrutiny. Under the Natural Gas Act, 15 U.S.C. § 717d(a), the Commission is without power to make reparation orders. *Federal Power Commission et al. v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Once a rate order has become final, and no longer subject to judicial review, any change in the rate must be made prospectively. Such a policy " * * * was designed to protect established expectations under legally established rate schedules. It forbids belated determinations that rates charged in the past were excessive." *Tennessee Valley Municipal Gas Association v. F.P.C.,* 152 U.S.App.D.C. 298, 304, 470 F.2d 446, 452 (1972). In summary, the Act prohibits the Commission from retroactively applying a "new rate" to a prior point in time, and requires the "new rate" to be enforced prospectively only.

In the case of *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway Co.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), the Supreme Court held that the Interstate Commerce Commission was bound to recognize the validity of the rule of conduct proscribed by it, and that it could not repeal its own enactments with retroactive effect. Rather, if the Interstate Commerce Commission wished to repeal the previous order and substitute a new one, it could do so, however, it could only impact

conduct subsequent to the new order. The Court went on to point out:

"Where, as in this case, the Commission has made an order having a dual aspect, it may not in a subsequent proceeding, acting in its quasi judicial capacity, ignore its own pronouncement promulgated in its quasi legislative capacity and retroactively repeal its own enactment as to the reasonableness of the rate it has proscribed." *Id.* (at 389, 52 S.Ct. at 186).

In order to proper analyze appellant's advance payment agreements, they must be viewed in the context of the time within which they were entered into. In the case of *United Gas Pipeline Co. v. F.P.C.,* 179 U.S.App.D.C. 274, 551 F.2d 460 (1977), the court described the period of time which produced agreements such as these, as " * * * a time of severe natural gas shortage when experimental programs fashioned to alleviate this problem were being implemented." *Id.* (179 U.S.App.D.C. at 279, 551 F.2d at 465).

The severe shortage of natural gas was reflected by the fact that at the time appellant's agreements were entered into and the advances made, front end advances were an accepted practice among pipelines competing for production of natural gas. For a pipeline such as appellant, the only guidance provided by Order No. 499 with respect to the advance-expenditure time relationship, was that the advances had to be expended within a reasonable time after their inclusion in the pipeline's rate base. There was no hint whatsoever of a rigid thirty-day rule or "line of credit" analysis being read into Order No. 499. In fact, the Administrative Law Judge in his Initial Decision, in *Columbia Gas Transmission Corporation,* Docket Nos. RP71–18, et al., issued January 18, 1974, expressly rejected the notion of a rigid thirty-day rule, stating in part (Decision, *mimeo,* pp. 19–20):

" * * * it seems clear that the Commission has viewed the need of the pipeline to obtain new sources of gas and the circumstances attending the securing of such additional supplies as significant in determining whether rate base treatment

should be accorded to advance payments. On the other hand, none of these orders mentions any of the specific requirements contended for by staff, that an advance payment must be shown to be related to the producer's costs, strictly limited to the amount and to the time actually needed, as prerequisites for granting approval of rate base treatment."

Furthermore, the Commission, itself, in its order on rehearing of Order No. 499, expressly rejected the suggestion of a rigid time standard. 51 F.P.C. 818–19 (1974). In reliance upon the expanding scope of the advance payment program, and the flexible advance-expenditure time standard of Order No. 499, the appellant contracted with producers of natural gas for advance payments under terms which would seem reasonable, when viewed in the context of the time in which they occurred.

Now, after the agreements are entered into and advances made, the Commission seeks to substitute a "30 day" rule into the language of Order No. 499. Essentially, the Commission is seeking to modify Order No. 499, and have the modification operate retroactively, so as to bring within its coverage the agreements between appellant and producers Mitchell and Burmah. While we do not quarrel with such a change by the Commission operating prospectively, under the holding of the Court in *Arizona Grocery Co., supra,* we cannot enforce such an alteration in Order No. 499 acting retroactively.

The Commission cites as authority for the establishment of a "30 day rule" in this proceeding the case of *Bell Aerospace Co. v. NLRB,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974). In that case the Court stated:

"The views expressed in [*S.E.C. v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)] and [*NLRB v. Wyman Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)] make plain that the Board is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's dis-

cretion. * * * The Board's judgment that adjudication best serves this purpose is entitled to great weight."

While recognizing the Board's broad discretionary power to proceed in an adjudicatory proceeding as opposed to by rulemaking, the Court in *Bell Aerospace Co., supra,* did point to situations when that discretion might be limited:

"The possible reliance of industry on the Board's past decision with respect to buyers does not require a different result. It has not been shown that the adverse consequences ensuing from such reliance are so substantial that the Board should be precluded from reconsidering the issue in an adjudicative proceeding. Furthermore, this is not a case in which some new liability is sought to be imposed on individuals for past actions which were taken in good faith reliance on Board pronouncements." *Id.* (416 U.S. at 295, 94 S.Ct. at 1772)

■ We believe that the facts in the present case do come within the exceptions elucidated by the Court in *Bell Aerospace Co., supra.* The consequences to the appellant of denying rate base treatment to the advances are very severe. It would mean the imposition of a large liability with regard to the advances in the present case. Furthermore, the appellant's entering into these agreements, under these terms, was in reliance upon the prior orders of the Commission, and the policies reflected in those orders, specifically the policies encouraging the advance payment program, with few restrictions, and the promulgation of a flexible standard with regard to the advance-expenditure time relationship. We believe that the aforementioned facts require that the Commission's discretion to proceed by adjudication as opposed to by rulemaking be restricted so as to prevent the imposition of a "30 day rule" in this proceeding.

In the case of *Consumer Federation of America v. F.P.C.,* 169 U.S.App.D.C. 116, 128, 515 F.2d 347, 359 (1975), the court set aside a Commission order exempting 180-day sales from direct regulation. In the

opinion, the Court spoke of the Commission's failure to provide the pipelines with sufficient guidelines to direct them in the purchase of emergency supplies. The absence of guidelines concerned the court because under the order in question, if the pipelines paid too much for the supplies of gas, they would wind up having to bear expenses which were not refundable. The court concluded:

> "The warning in Order [No.] 491 against 'improvident' contracts does not provide adequate guidance to protect the pipelines. * * * But a commission seeking to defend an exemption order cannot in this way ignore its responsibility to give guidance to pipelines that accept the Commission's open-door invitation to obtain needed supplies through Order 491 purchases."

While the factual pattern of *Consumer Federation of America, supra,* is not identical to the present case, the opinion does demonstrate an effort being made to protect the pipeline companies from the squeeze which results if the pipeline incurs expenses for emergency gas which is not refundable. A very similar type of problem to that discussed in *Consumer Federation of America, supra,* is present in this case. Through Order No. 499, and the four previous orders, the Commission encouraged a program of advances by interstate pipelines to producers to secure commitments of natural gas. Furthermore, inherent within the Commission's orders was an attitude of experimentation and flexibility as reflected in the "reasonable time" standard which the Commission chose to include in Order No. 499. Nevertheless, in electing to utilize a "reasonable time" standard, by itself, the Commission failed to furnish the pipelines with any sort of guidelines which might be followed in contracting with producers for commitments of gas reserves. Then after the agreements are entered into and the advances made, the Commission wants a "reasonable time" to be defined as "30 days", with the obvious effect of such action being that the pipeline would be forced to absorb huge costs which are not capable of being reflected in its rate base. To

follow the course set forth by the Commission would be to contravene the policy expressed by the court in *Consumer Federation of America, supra.*

Accordingly, the orders of the Commission in Docket No. RP73–110 are hereby reversed and the proceeding remanded for action consistent with this opinion.

So ordered.