SEWELL COAL COMPANY, Petitioner,

v.

FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION, Secretary of Labor, Respondents.

No. 81–1592.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1982.

Decided Aug. 30, 1982.

C. Lynch Christian, III (Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., on brief), for petitioner.

Nancy S. Hyde, Washington, D. C. (T. Timothy Ryan, Jr., Sol. of Labor, Cynthia L. Attwood, Associate Sol., Michael A. McCord, Appellate Litigation, Washington, D. C., on brief), for respondents.

Before BUTZNER, WIDENER and PHILLIPS, Circuit Judges.

BUTZNER, Circuit Judge:

A federal mine inspector cited the Sewell Coal Company for two violations of safety standards. An administrative law judge vacated the citations because he concluded that compliance with the standards was impossible under the circumstances. On review of this decision, the Federal Mine Safety and Health Review Commission ac-

cepted the administrative law judge's factual findings but held that compliance had not been impossible.[1] The administrative law judge then imposed a $1 penalty for each violation, and Sewell petitioned this court for relief. We affirm.[2]

## I

From December 1977 to March 1978, the United Mine Workers struck coal mines throughout the nation. Because of the strike, Sewell was able to employ only supervisory personnel in its mine. Thirty-three supervisors worked around-the-clock shifts during the strike, seven days a week, producing no coal, but bending their efforts entirely to maintenance and repair. Nevertheless, the mine deteriorated rapidly. A glassy shale, subject to frequent fractures and crumbling, composed the mine roof; natural water accumulation required pumping at the rate of about 500,000 gallons a day. Undulations in the floor of the mine allowed unpumped water to collect in many places.

In February 1978, during the strike, a federal mine inspector observed two conditions that violated federal mine safety standards. Water up to 16 inches deep filled a 40-foot section of a designated escapeway, making an emergency exit difficult, particularly if a miner were to become disabled. See 30 C.F.R. § 75.1704 (1981). The roof of another area had begun to fracture, already dropping rock debris on the floor. See 30 C.F.R. § 75.200. The inspector issued two notices of violation.

At a hearing before an administrative law judge, Sewell, relying on Buffalo Min-

ing Co., 2 IBMA 226 (1973), contended that the notices should be vacated because the shortage of maintenance workers made compliance with the standards impossible. The judge agreed with Sewell, and the Secretary of Labor appealed to the Commission. Accepting all the factual findings of the administrative law judge, the Commission concluded that Sewell had not made out the defense of impossibility as defined in Buffalo Mining. In its opinion, the Commission said:

The Secretary does not contest these factual findings and the record as a whole supports them. Rather, the Secretary challenges the judge's conclusion from those facts, that compliance was impossible. The Secretary submits that the operator had discretion; it could assign its 33 management personnel to whatever tasks it deemed important. He argues that although it may have been difficult to do a complete examination of the mine so as to detect all violative conditions, such action was not impossible. To the extent violative conditions are found that cannot be corrected promptly, the operator could, argues the Secretary, danger-off and post such areas so as to prevent miner access and exposure.

We agree with the Secretary that the facts relied on by the judge do not support a finding that compliance with the cited standards 'was impossible. In fact, the [violations were] abated by the operator very soon after the citations were issued. When, as here, compliance is difficult but not impossible, the appropriate consideration of such mitigating circum-

1. *Secretary of Labor v. Sewell Coal Co.*, Doc. No. HOPE 78 ·744–P (F.M.S.H.R.C. June 11, 1981).

2. When the inspector issued the notices of violation to Sewell, he acted under the authority of the Federal Coal Mine Health and Safety Act of 1969, Pub. L. No. 91–173, 83 Stat. 742. That Act placed the mine inspection program under the Department of the Interior. Administrative appeals were taken to the Interior Board of Mining Appeals. Shortly after the notices were issued, the 1969 Act was substantially amended by the Federal Mine Safety and Health Amend-

ments Act of 1977, Pub. L. No. 95–164, 91 Stat. 1290. The new Act transferred the inspection program to the Department of Labor and replaced the Board of Mining Appeals with the Federal Mine Safety and Health Review Commission.

Thus, notices of violation were issued under one statute, but the review procedure was governed by another. The two Acts, however, are nearly identical for our purposes. The 1977 Act refers to "citations," the 1969 Act to "notices of violation;" we use the terms interchangeably.

stances is in the assessment of the penalties.

In sum, we hold the judge erred in recognizing an affirmative defense of impossibility of compliance in this case. Accordingly, the notices of violation are reinstated and affirmed and the case is remanded for the assessment of civil penalties.[3]

On remand from the Commission, the administrative law judge assessed a penalty of $1 for each violation,[4] and Sewell appealed pursuant to 30 U.S.C. § 816(b) (Supp. III 1979).

## II

Sewell first argues that compliance with the standards was impossible. *Buffalo Mining* established this defense. In that case, the Interior Board of Mining Appeals held that the 1969 Act did not allow an operator to be penalized for conditions in a mine that "cannot be effectively abated through the use of existing technology." 30 U.S.C. § 814(h)(1) (1970) (current version at 30 U.S.C. § 817(b)(1) (Supp. III 1979)). The Board construed that phrase to apply to conditions that violated a mandatory safety standard but that could not be corrected because of "unavailability of equipment, materials, or qualified technicians." *Buffalo Mining*, 2 IBMA at 259. In this case, Sewell argues that the Commission, successor to the Board of Mining Appeals, should interpret *Buffalo Mining* to apply to Sewell's violations.

We believe that the Secretary's and the Commission's interpretation of *Buffalo Mining*, like an agency's interpretation of its own regulations, "if reasonable, . . . is controlling despite the existence of other interpretations that may seem even more

reasonable." *Lucas Coal Co. v. Interior Board of Mine Operations Appeals,* 522 F.2d 581, 584 (3d Cir. 1975). *See also Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945) (an agency's interpretation of its own regulation is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation."). Indeed, the legislative history of the 1977 Act states plainly Congress's intention "that the Secretary [of Labor's] interpretations of the law and regulations shall be given weight by both the Commission and the courts."[5] The Commission's rejection of the impossibility defense is not unreasonable, plainly erroneous, arbitrary, or inconsistent with mine safety regulations.

Sewell also argues that if the Secretary should announce ahead of time a requirement for posting signs, Sewell would comply in the future; but a rule unknown to Sewell at the time should not be retroactively applied.

We think that this argument, compelling though it appears, is foreclosed by a number of Supreme Court decisions beginning with *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) (*Chenery II*). In that case, the SEC had applied an innovative, adjudicatory order retroactively. The Supreme Court upheld the SEC. After expressing a preference for rule making over adjudication as a means of filling in statutory gaps, the Court observed, nevertheless, that "any rigid requirement [that rule making be used instead of adjudication] would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise." *Chenery II,* 332 U.S. at 202, 67 S.Ct. at 1580. The Court went on at some length to make this point clear:

3. *Secretary of Labor v. Sewell Coal Company,* Doc. No. HOPE 78–744–P (F.M.S.H.R.C. June 11, 1981).

4. In his brief before the Commission, the Secretary said:

[T]he proper place for consideration of the argument raised by Sewell—that it could not comply with the Coal Act because it had limited manpower—is in assessment of the

civil penalty. The fact that most employees were on strike may well mitigate the gravity and negligence associated with the violations. The Secretary does not question the propriety of the $1 penalties.

5. S.Rep. No. 181, 95th Cong., 1st Sess. 49 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 3401, 3448.

Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one'form of action to the exclusion of the other is to exalt form over necessity.

In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.

332 U.S. at 202–03, 67 S.Ct. at 1580. Retroactive application of the SEC's new rule was expressly found to be "not necessarily fatal to its validity." 332 U.S. at 203, 67 S.Ct. at 1580.

In a more recent decision, the Supreme Court relied on *Chenery II* to reaffirm that an administrative agency may announce and apply new principles in an adjudicative proceeding, particularly where the situations to be governed by the principle may vary in factual detail. In *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974), the Court wrote: "The views expressed in *Chenery II* and [*NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)] make plain that the Board is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion."

█ Neither the 1969 nor the 1977 Act exempts struck mines from safety standards. Indeed, neither these Acts nor their implementing regulations expressly recognize the defense of impossibility when violations can be corrected through the application of existing technology. The defense of impossibility, on which Sewell relies, was created by administrative adjudication from principles that are implicit in the 1969 Act. Because the circumstances for invoking the defense are diverse and not readily foreseeable, we conclude that case-by-case adjudication rather than rule making is appropriate for defining its scope. Certainly we cannot say that undertaking this task through adjudication amounted to "abuse of discretion or a violation of the Act." *See Bell Aerospace*, 416 U.S. at 294, 94 S.Ct. at 1771. *Chenery II* and *Bell Aerospace* also demonstrate that retroactive application of a novel principle expounded in an adjudicatory proceeding does not infringe the rights secured by the due process clause.

III

█ Sewell also contends that inspections during a strike, and consequently the issuance of citations, are not authorized by either the 1969 or 1977 Act or by the Secretary's regulations. Sewell's major premise is that the mine was idle. It relies on 30 C.F.R. § 75.1704–2(c)(1), which provides that escapeways must be inspected at least once a week, though inspections "need not be made during any week in which the mine is idle for the entire week, except that such examination shall be made before any miner . . . returns to the mine."

We cannot accept Sewell's position. The record establishes that although the mine was not producing coal, it was not idle. The administrative law judge found that 33

men were working in the mine on round-the-clock shifts. These men were engaged in rock dusting, pumping, timbering, and ventilation work—tasks also performed when the mine is producing coal. More-over, Sewell retained discretion to assign the men to any part of the mine, and the company's safety director testified that he had no way of knowing whether any of the workers had traveled throughout the mine during the strike. Clearly, these employees were exposed to many of the same hazards found in a producing mine.

The purpose of both the 1969 and 1977 Acts is to protect the health and safety of miners. 30 U.S.C. § 801 (1970 & Supp. III 1979). Although Sewell's workers were management personnel, they were not de-nied this protection. On the contrary, they were specifically covered by both Acts. Section 802(g) (1970 & Supp. III 1979) defines a miner as "any individual working in a coal ... mine." We therefore conclude that the regulation on which Sewell relies does not exempt a struck mine from inspec-tion and citation when the operator's em-ployees are working in the mine.

Sewell also relies on 30 U.S.C. § 814(a) (Supp. III 1979), which provides that if an inspector "believes that an operator ... has violated [the Act] or any mandatory health or safety standard, rule, order, or regula-tion ... he shall, with reasonable prompt-ness, issue a citation." This section, Sewell contends, should be construed to authorize citations only when an operator affirma-tively commits a violation. Although con-ceding the existence of the cited conditions, Sewell asserts that they resulted from natu-ral deterioration during the strike and not from its affirmative act.

■ Sewell's interpretation of § 814(a) would require proof of negligence. This interpretation is warranted by neither the text of the Acts nor their legislative histo-ry. Section 814(a), on which Sewell relies, pertains to the duties of mine inspectors. The liability of an operator is governed by

§ 820(a) (Supp. III 1979) which states: "The operator of a coal or other mine *in which a violation occurs* of a mandatory health or safety standard or who violates any other provision of this chapter, shall be assessed a civil penalty ...." (emphasis added)[6] The legislative history of the predecessor to this section in the 1969 Act discloses that it was intended to provide for "liability for violation of the standards against the operator without regard to fault."[7] Thus, Sewell's contention lacks statutory support. *See Secretary of Labor v. Ace Drilling Coal Co.*, 2 F.M.S.H.R.C. 790, 791 (1980), *aff'd without opinion*, 642 F.2d 440 (3d Cir. 1981) (imposing liability with-out fault).

Although an operator may be liable with-out fault, the question of negligence is not eliminated from the administration of the Act. Section 820(i) (Supp. III 1979) pro-vides that a consideration in assessing the amount of a penalty is "whether the opera-tor was negligent." When the case was remanded from the Commission, the admin-istrative law judge applied this provision by assessing two $1 penalties.

■ Sewell relies for further support on a memorandum from a mine safety official written after the start of the strike. The memorandum recognized the problems of inspections during strikes and called for "spot inspections" the week before and af-ter the strike ended. Because the inspec-tion did not occur within this two-week period, Sewell urges us to read this memo-randum as an authoritative directive that the citations should not have been issued. We decline to do so.

The memorandum directs field inspectors to inspect struck mines promptly when it appears that miners will soon return to work. These citations were issued, how-ever, during a regular, rather than a spot, inspection. Unless a mine is closed and sealed, the memorandum did not, and prob-ably could not, modify the statutory provi-

6. This provision of the 1977 Act was also a part of the 1969 Act, 30 U.S.C. § 819(a) (1970).

7. Conf.Rep. No. 761, 91st Cong., 1st Sess. 71, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2503, 2578, 2586.

sion pertaining to regular inspections that requires the Secretary to "make inspections of the entire mine at least four times a year." 30 U.S.C. § 813(a) (1970) (current version at § 813(a) (Supp. III 1979)).

We find no merit in Sewell's other contentions. The decision of the Commission is affirmed.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I believe the doctrine of impossibility expressed in *Buffalo Mining Company* is applicable here. I also do not believe that *Chenery II* or *Bell Aerospace* authorizes the imposition of a fine without notice even if an administrative position is changed as result of adjudication. The language of *Bell*, indeed, explicitly explains that that decision was not a case in which a fine was involved.

I

As the majority opinion correctly sets out, the Secretary does not contest the factual findings of the administrative law judge; rather, they have been accepted throughout this proceeding.

Among those findings are that Sewell had 203 underground employees[1] before the strike and 32 during it. These 32 employees worked on three shifts, 24 hours a day, seven days a week, only in "fixing up hazard conditions." The conditions cited in the two notices of violation were the result of natural deterioration in the mine during the strike. There were not sufficient personnel available during the strike to eliminate all the conditions which occurred in the mine as result of natural deterioration which might constitute violations. Sewell followed the practice of correcting the most serious conditions first.

Although the Secretary accepted these findings of fact among others, and although

he admitted that the mine operator had discretion in performing repairs by assigning its available personnel to whatever tasks it deemed important, he took the position, which the Commission accepted, that the mine operator should have "danger[ed] off [roped off] and post[ed] such areas so as to prevent miner access and exposure." As a result of the finding of the Commission that the operator should have roped off and posted some of the areas where conditions existed in violation of safety standards, the Commission then found that the repair of the conditions at the two locations for which violations were charged was "difficult but not impossible." Having found the repair work to be "difficult" rather than "impossible," the Commission then remanded the case to the administrative law judge for imposition of the fines.

No safety standard exists, either by way of statute or regulation, that a condition in a mine which is a violation of a safety standard may be brought into compliance by roping it off and posting it.[2] A simple reference to the admitted facts I have recited above shows that the conditions for which Sewell was fined were in fact impossible to correct, for Sewell was working all available personnel around the clock seven days a week doing nothing but correcting the natural deterioration of the mine. It also was correcting the most serious conditions first. Thus, it is admitted that it was in fact impossible for the two conditions for which violations were charged to have been corrected without letting other and more serious conditions go.

I think that the holding of *Buffalo Mining Company*, at 259, "that Congress did not intend that a Section 104(b) notice be issued or a civil penalty assessed where compliance with a mandatory health or safety standard is imposed due to unavailability of equipment, materials, or qualified technicians," applies here. While the Secretary admits

1. Normally, underground, there is one maintenance man for each production man.

2. 30 U.S.C. § 863(d) requires preshift examinations of mines and posting of danger signs in hazardous places. Sewell was not charged

with violation of the preshift examination statute, and the record is clear that the posting of signs under that statutory provision has nothing to do with the case at hand.

that correcting the conditions in question was in fact impossible, he changes the legal effect of "impossible" to that of merely "difficult" by the simple stratagem of invoking a new regulation unheard of until that time, that of roping off and posting. This departure from logic, accepting the standard of review in the majority opinion at 1069, I think, is not only unreasonable and plainly erroneous, it is arbitrary and inconsistent with mine safety regulations. Indeed, there is no regulation. And this is also admitted.

## II

The Board concluded, and the majority notes, that Sewell could have posted signs and roped off the areas of the mine in question, thereby avoiding liability. So Sewell is in actuality being fined for not roping off the areas involved and posting signs. As before noted, no statute or regulation contains such a requirement; neither was notice provided from the agency regarding this requirement.[3]

The majority dismisses this argument, relying upon Chenery II and Bell Aerospace, but the difficulty with the reasoning of the majority is that neither of those cases involved the imposition of a fine without notice. While I, of course, agree that an administrative agency may adopt new principles through adjudicative proceedings, I do not believe that this means that the agency may then go a step further and impose a fine for the new violation.

The Supreme Court itself acknowledged just such a distinction in Bell Aerospace when it stated at 295:

The possible reliance of industry on the Board's past decisions with respect to buyers does not require a different result. It has not been shown that the adverse consequences ensuing from such reliance are so substantial that the Board should be precluded from reconsidering the issue in an adjudicative proceeding. Furthermore, this is not a case in which some new liability is sought to be imposed on individuals for past actions which were taken in good faith reliance on Board pronouncements. Nor are fines or damages involved here.... (Italics added.)

The Ninth Circuit has applied this language from Bell to prevent the Immigration and Naturalization Service from establishing a new standard through adjudication when its application would have resulted in deportation or voluntary departure. Ruangswang v. INS, 591 F.2d 39 (9th Cir. 1978). The court looked at the lack of notice, the severity of the consequences, and the right of the alien to rely on the regulations in effect at the time in concluding that the agency abused its discretion in so acting through the adjudicatory process.[4]

I believe that the quoted language from Bell is equally applicable here. A fine must be said to be an adverse consequence of considerable import regardless of its amount. Especially when I couple this with the fact that Sewell had no notice at all of any roping off and posting requirement un-

---

3. Probably in violation of the notice provisions of 30 U.S.C. § 814.

4. The following cases have relied upon Bell in refusing to permit administrative change of position without notice by adjudication. Bahat v. Sureck, 637 F.2d 1315 (9th Cir. 1981) (similar to Ruangswang); Natural Gas Pipeline Co. v. FERC, 590 F.2d 664 (7th Cir. 1979) (court disallowing the termination of rate base treatment of advances); United Gas Pipe Line Co. v. FERC, 597 F.2d 581 (5th Cir. 1979), cert. den. 445 U.S. 916 (1980) (court disallowing the termination of rate treatment of advances); Drug Package, Inc. v. NLRB, 570 F.2d 1340 (8th Cir. 1978) (court refusing to enforce retroactive bargaining order). In Air Products & Chemicals,

Inc. v. FERC, 650 F.2d 687 (5th Cir. 1981), the court did permit the agency to abandon a previously approved incentive plan, but, relying upon Bell, found insufficient adverse consequences to those affected. See also the following cases, which, not relying upon Bell, have spoken against retroactive application of administrative rulings changed by adjudication. Lodges 743 & 1746, etc. v. United Aircraft, 534 F.2d 422 (2d Cir. 1975), cert. den. 429 U.S. 825 (1976); NLRB v. Majestic Weaving Co., 355 F.2d 854 (2d Cir. 1966); NLRB v. E & B Brewing Co., 276 F.2d 594 (6th Cir. 1960), cert. den. 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 236 (1961); NLRB v. International Brotherhood of Teamsters, 225 F.2d 343 (8th Cir. 1955).

til the case was tried, I can find no reason that the public interest requires such *ad hoc* rule making by adjudication rather than by the standard procedures. See *Majestic Weaving*, 355 F.2d at p. 860.

I would reverse the Commission.