**UNITED GAS PIPE LINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**No. 78–1091.**

United States Court of Appeals, Fifth Circuit.

June 22, 1979.

Rehearing Denied Aug. 8, 1979.

Irving Jacob Golub, Stephen A. Wakefield, David H. Thornberry, Houston, Tex., for petitioner.

Stephen J. Small, Charleston, W. Va., for Columbia Gas Transm. Corp.

Michael J. Manning, Washington, D. C., for Entex, Inc.

Paul E. Goldstein, Chicago, Ill., for Natural Gas Pipeline.

Terence J. Collins, Melvin Richter, Dale A. Wright, Washington, D. C., Lilyan G. Sibert, Leland F. Cadenhead, Houston, Tex., for Tennessee Gas Pipeline Co.

Howard E. Shapiro, Sol., Robert R. Nordhaus, General Counsel, Barbara Weller, Atty., Washington, D. C., for respondent.

Karol Lyn Newman, Washington, D. C., for Laclede Gas Co.

Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In this case United Gas Pipe Line Company (United) and various intervenors [1] contend that the Federal Energy Regulatory Commission (FERC) has acted arbitrarily in denying recovery of costs that they should reasonably be able to pass on to their customers. We agree that the challenged Commission action [2] is unreasonable and, therefore, reverse.

### The Commission Sets The Stage: Background

This dispute began when—in the context of a critical natural gas shortage—the Commission [3] issued Order 410,[4] which announced the initiation of its advance payment program. Under this program interstate pipeline companies advanced funds, interest free, to producers for exploration and development of natural gas reserves. The producers, in turn, committed the gas to be developed with those funds to the individual pipeline companies that had made the advances and thus to the interstate market. To encourage the pipelines to participate and to offset the resultant costs of the program, the Commission allowed them to include the costs of the advance payments in their rate base.[5]

In doing so the Commission explained that this method of accounting would have "encouraging effects" on gas supply. 44 FPC at 1143. It further stated that,

particularly at the present time when there are indications of a natural gas shortage, it is not in the public interest for pipeline companies to bear the costs of assuring themselves and their customers a future supply of natural gas. We believe that, when it is necessary for pipeline companies to make advance payments in order to contract for gas supplies, it is equitable that the companies should earn on the amounts advanced.

*Id.* at 1144.[6] Order 410 and its companion

---

1. Tennessee Gas Pipeline Company, a division of Tenneco Inc., Natural Gas Pipeline Company of America and Columbia Gas Transmission Corporation.

2. Specifically, plaintiffs appeal from Commission Opinions No. 815 and 815–A.

3. This order was issued by the Federal Power Commission. Pursuant to the Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (1977), 42 U.S.C.A. §§ 7101, *et seq.* (Supp.1977), and Executive Order No. 12,009, 42 Fed.Reg. 46,267 (1977), on October 1, 1977, the Federal Power Commission (FPC) ceased to exist and most of its regulatory responsibilities, including those under Section 4 of the Natural Gas Act, 15 U.S.C.A. § 717c, were transferred to the Federal Energy Regulatory Commission (FERC). Accordingly, as used herein, the term "Commission" means the FPC when referring to actions taken prior to October 1, 1977, and means the FERC when referring to actions taken on or after October 1, 1977.

4. *Accounting and Rate Treatment of Advance Payments to Suppliers for Gas and Amending F.P.C. Form No. 2,* FRC Order No. 410, 44 FPC 1142 (1970). The Commission's other initial advance payment orders clarified and slightly modified Order 410: *Accounting and Rate Treatment of Rate Payments to Suppliers for Gas and Amending F.P.C. Form No. 2,* FPC Order No. 410–A, 45 FPC 135 (1971); *Accounting and Rate Treatment of Advance Payments to Suppliers for Exploration and Lease Acquisition of Gas Producing Properties,* FPC Order 441, 46 FPC 1178 (1971), *rehearing denied,* 47 FPC 57 (1972).

5. Costs included in rate base are those on which the pipeline may earn a return by inclusion in the price of gas service to their customers.

6. In Order No. 410–A, *see* note 3, *supra,* the Commission stated that ". . . we have determined that advances by pipelines to independent producers for exploration and lease acquisition costs will be assured of accounting

orders,[7] which governed the program from its inception through December 28, 1972, were affirmed by the Circuit Court of Appeals for the District of Columbia as a "justifiable experiment in the continuing search for solutions to our Nation's critical shortage of natural gas." *Public Serv. Comm'n of New York v. FPC,* 1972, 151 U.S.App.D.C. 307, 317, 467 F.2d 361, 371 (*New York Comm'n I*).[8]

In late December of 1972 the Commission issued its Order 465,[9] which extended the advance payment program for one year, up to Dec. 31, 1973, and made specific changes regarding which costs could appropriately be included in rate base and the schedule for repayment of advances. Following a round of comments from various producers, pipelines, and affiliated companies, the Commission again extended the program, up to Dec. 31, 1975, in its Order 499.[10] It also announced a general policy to deny

rate base treatment for advances "in excess of costs for exploration and development, and production incurred by the producer within a reasonable time from the date such amounts advanced are included in the pipeline's rate base."[11] Before Order 499 the only guidance the Commission had offered provided that advances would be allowed in rate base if found reasonable and appropriate.[12]

Upon review of Orders 465 and 499 the District of Columbia Circuit held that the Commission's action did not "amoun[t] to the kind of evaluation of the experience under the programs [required] to discharge [its] responsibility 'to determine [as instructed in *New York Comm'n I,* 467 F.2d at 371] whether its justifying objectives are being satisfactorily met at an acceptable level of ultimate economic cost to the nation's gas consumers.'" 167 U.S.App.D.C. at 110, 511 F.2d at 348.[13] The Court thus

and rate treatment pursuant to Order No. 410 as modified herein." 45 FPC at 135.

In Order 441, *see* note 3, *supra*, the Commission restated its concern that

a critical shortage of gas exists in the United States; capital formation for gas development is difficult. *The objective of providing capital to accelerate the addition of new gas supplies* supports our continuation for the limited period of the rate treatment of advance payments provided herein.

46 FPC at 1180 (emphasis added). It then made a change in the accounting procedure for handling advance payments. The original Account 166 would still contain includable (in rate base) advances—those that "are *reasonable, necessary and appropriate in order to contract for gas supplies* . . . ." *Id.* (emphasis added). But a new account, 167, would contain "all other advance payments for gas, including exploration and lease acquisitions. Reasoning that such advances "have not shown *to be an effective vehicle for stimulating the* widespread participation in natural gas production for which their encouragement was intended," the Commission determined that they should not be included in rate base. *Id.*

7. Orders 410–A and 441.

8. As the D.C. Circuit explained in *Public Serv. Comm'n of New York v. FPC,* 1975, 167 U.S. App.D.C. 100, 103, 511 F.2d 338, 341 (*New York Comm'n II*), in its prior opinion it had sustained the advance payment scheme on the basis of "the temporary character of the FPC order" and "our belief that it represented a justifiable experiment . . . ." We

stressed the need for further evaluation by the FPC prior to any continuation of rate base treatment of advance payments to producers.

9. *Accounting and Rate Treatment of Advance Payments Included in Account 166, Advance Payments for Gas Development and Production,* FPC Order No. 465, 48 FPC 1550 (1972), *rehearing denied,* 49 FPC 517 (1973).

10. *Accounting and Rate Treatment of Advances Included in Account No. 166, Advances for Gas Exploration, Development and Production,* FPC Order No. 499, 50 FPC 2111 (1973), *rehearing denied,* 51 FPC 818 (1974).

11. 50 FPC at 2115. While the Commission expanded the program's reach in several areas, this was the only limitation it contained.

12. This is essentially the standard Congress has imposed on all natural gas rates. See § 4(a) of the Natural Gas Act, 15 U.S.C.A. § 717c(a).

13. The Court further explained that

[j]ustification of the program depends on the attraction of new or additional quantities of gas supply to the interstate market, . . . The record fails to disclose any effort by the FPC either to quantify the amount of gas attracted, . . . or to gauge the average time saved as a result of the program's speeding of capital formation. *Id.*

remanded the proceeding for further consideration, but allowed the advance payment program to remain in effect pending Commission action on remand. In response to the District of Columbia's mandate, the Commission issued its Order on Remand,[14] terminating the program prospectively as of December 31, 1975.

### The Star Makes Her Entrance: United's Case

United participated in the Commission's advance payment program [15] and, in various rate proceedings, applied for rate base treatment of the costs of making advances. The proceedings in question here concerned costs incurred from April 6, 1974, through May 19, 1975 (the period). Settlement negotiations among United, the Commission staff, and United's customers ultimately resulted in a Stipulation and Agreement pursuant to which United's rates and refunds were based on United's actual operating experience during such period.[16] After reviewing the settlement agreement, the Commission issued Order No. 815,[17] in which it approved the agreement, but only with the addition of significant modifications. One of these was the denial of rate base treatment for $23,380,650 of the $79,238,960 of outstanding advances United carried during the period. Reasoning that all advances spent more than 30 days after inclusion in rate base (front-end advances) were "presumptively extravagant" [18] the Com-

mission found that it would be unjust and unreasonable to pass the costs on to United's customers.

United sought rehearing on Opinion No. 815, thus prompting the Commission's issuance of Opinion No. 815–A. In response to United's argument that the Commission had elevated its "presumption" to a retroactively applied legal standard, the Commission merely stated that

[o]ur conclusion that a portion of United's advance payments at issue in this proceeding are unreasonable and inappropriate costs for rate making purposes reflects nothing more than our judgment on the record that the carrying cost of the advances challenged in this case should not be borne by United's consumers. The Commission has not announced a new rule and applied it retroactively.

Apparently distinguishing between the meaning of "reasonable" in regulatory and business contexts, the Commission further added that

[t]he 'reasonable and appropriate' standard applied here is simply a restatement of this Commission's statutory obligation to review all pipeline expenditures in order to determine their prudence. We do *not* find that, as a matter of business acumen, United was unwise to enter into front-end advance payment agreements. We find only that under settled rate making practices these particular expenditures by United were of no present bene-

---

14. *Accounting and Rate Treatment of Advances Included in Account No. 166, Advances for Gas Exploration, Development and Production,* Docket Nos. R–411 and RM 74–4 (Order on Remand for Court Opinion Terminating Investigation and Terminating Programs with Conditions) (December 31, 1975).

15. Most of United's advances are governed by Order 465, with the remainder being governed by Order 499.

16. During the settlement negotiations, the parties agreed to reserve three issues for decision by the Commission. A hearing was held on these issues, and the Presiding Law Judge certified the record and the Stipulation and Agreement to the Commission on December 24, 1975. We have before us only the Commission's modification of the settlement agreement.

17. *United Gas Pipe Line, Opinion and Order on Reserved Issues and Otherwise Approving Settlement Agreement,* Docket Nos. RP 74–20, RP 74–83, Opinion No. 815 (July 29, 1977).

18. *In Tennessee Gas Pipeline Co.,* Opinion No. 769, 55 FPC —— (July 9, 1976), *mimeo* at 31, the Commission first held that front-end advance payments, i. e., those made by pipelines but not spent by the producers within thirty days of their inclusion in rate base) were "presumptively extravagant" under Order No. 499, 50 FPC 2111 (1973). It further explained, however, that a finding of presumptive extravagance "may be rebutted by a showing that the front-end advance is, nevertheless, reasonable and appropriate because a positive benefit is conferred on the consumer." *Mimeo* at 32.

fit to its customers during the locked in period involved in this case.

### The Plot Thickens: United's Claims And The Applicable Law

United now appeals to this Court, claiming that because they gave insufficient guidance regarding any timing relationship between advance and expenditure, the Commission's Orders 465 and 499 did not constitute reasonable notice of the FERC's subsequently imposed 30-day presumption. Moreover, United asserts, the Commission did not properly analyze the circumstances surrounding the advancing of the funds. The Commission counters that it has merely imposed the § 4(a) "just and reasonable" standard [19] and has determined that in this case, considering all the record evidence, 30 days was a reasonable time to allow between the pipeline's advances and the producers' spending the funds.

The Supreme Court has defined our responsibilities as a reviewing Court:

First, [we] must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, [we] must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, [we] must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable.

*Permian Basin Area Rate Cases,* 1968, 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312.

It has further instructed that:

[a] presumption of validity . . . attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

*Id.* at 767, 88 S.Ct. at 1360. We are not, however,

obliged to examine each detail of the Commission's decision; if the "total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [Natural Gas] Act is at an end".

*Id.*

We thus begin our consideration of this appeal with an examination of the context in which United made its advance payment contracts. As we have previously explained, this was "a time of severe natural gas shortage when experimental programs fashioned to alleviate this problem were being implemented." *United Gas Pipeline Co. v. FPC,* 1977, 179 U.S.App.D.C. 274, 551 F.2d 460. In one of these programs the Commission not only authorized but encouraged pipelines to make essentially interest free loans in order to attract natural gas supplies for interstate pipelines.[20] Creating the impression that it was regulating the particulars of the program,[21] the Commis-

---

**19.** Section 4(a) of the Natural Gas Act, 15 U.S.C.A. § 717c(a):

(a) All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

**20.** Since producers could sell at higher prices intrastate, this program was presumably designed to induce producers to sell to pipelines those supplies previously sold on the intrastate market and those for which producers would have a strong economic inducement to *commit* to the intrastate market.

**21.** Two examples of these seemingly specific guidelines are (1) Order 441's addition of a requirement that the advances be repaid even if production was not obtained and (2) Order

sion modified and clarified its initial advance payment order several times between 1970 and 1973. None of these modifications, however, specified a concrete timing relationship between pipeline's advance and producer's expenditure.

As a result of the Commission's program, advance payments became an accepted practice, indeed an essential tool,[22] for pipelines attempting to contract for gas supplies. When, in Order 499, the Commission did announce its intention to impose some sort of requirement, it merely provided that the advances had to be expended within a reasonable time after their inclusion in rate base. "There was no hint whatsoever of a rigid 30-day rule or 'line of credit' analysis being read into Order No. 499." [23] *Natural Gas Pipeline Co. v. FERC,* 7 Cir., 1979, 590 F.2d 664 (1979).

465's addition of a requirement that advances be removed from rate base at the end of five years if deliveries had not commenced or immediately if gas developed with the advance was sold to a company other than the pipeline making the advance.

**22.** *See* testimony of United's witness D. Lamar Smith, R. at 47–56.

Although the District of Columbia Circuit in New York Comm'n II questioned, if not repudiated these findings of the Commission largely because the data were insufficient to show a relationship between the advances and increased proven reserves—a matter on which we might well have quite different views, *see Placid Oil Co. v. FPC,* 5 Cir., 1973, 483 F.2d 880, *aff'd sub nom., Mobil Oil Corp. v. FPC,* 1974, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72—Opinion 499 stated that

[o]ur review of the data compiled in the Summary Report indicates that the advance payment program has continued to meet its objectives of bringing additional gas supplies into the interstate market at acceptable cost to the nation's gas consumers. The total amount of proven reserves resulting from the advance payment program has increased from 9.5 trillion cubic feet (Tcf) in the lower 48 states noted in Order 465 to approximately 10.3 Tcf. A more significant increase has occurred in the total of potential reserves discovered within the lower 48 states which has risen from a level of 4.75 Tcf in Order 465 to a level of 9.5 Tcf in the present Summary Report. This dramatic increase in potential reserves has occurred, for the most part, as a result of advances made pursuant to contracts subject to Order No. 465. This is borne out further by a comparison of the levels of proven and potential reserves found

Examining first the Order 465 advances, we find that the Commission unreasonably denied rate base treatment. The 30-day "presumption," as applied to these payments, arbitrarily imposes a new dimension and a new restraint, especially in light of other specific modifications in 465 and previous orders.[24] The Commission's Orders 465 and 499 provided no detail, or even broad explanatory statements, instructing the pipelines regarding a payment-expenditure relationship. The first time they really announced this requirement was in Opinions 769 and 769–A, see note 18, *supra.* The law will not tolerate this sort of after-the-fact, in fact retroactive, imposition of standards. *Hill v. FPC,* 5 Cir., 1964, 335 F.2d 355.[25] Moreover, there was simply no evidence either to support or justify the pre-

in the first 7–8 months period under Order 441 (46 FPC 1178) and a comparable period under Order No. 465. For Order 411, the level of proven resources was .8 Tcf while under Order 465 it was .5 Tcf. However the level of *potential* reserves within the lower 48 states increased from .56 Tcf under Order 441 to 4.97 under Order 465. This increase in the level of potential reserves is due, in part, to the fact that Order No. 465 re-allowed exploratory advances while continuing to permit advances for gas development and production while advances under Order 441 were limited to gas development and production alone.

**23.** The ALJ who issued the initial decision in *Columbia Gas Transmission Corp.,* Docket Nos. RP 71–18, issued January 18, 1974, apparently agreed. He expressly rejected the staff's proposal of a rigid 30-day rule:

On the other hand, none of these orders mentions any of the specific requirements contended for by the staff, that an advance payment must be shown to be related to the producer's costs, strictly limited to the amount and to the time actually needed, as prerequisites for granting approval of rate base treatment.

*Mimeo* at 19–20.

**24.** *See* note 21, *supra.*

**25.** The Court stated that

[t]he question in this case is whether it is too late for an agency to declare the standards to be met by its decision holding that they have not been met. The answer, quite obviously, is in the affirmative.

335 F.2d at 356.

sumption of extravagance for these non-thirty day advances. The Commission stresses the testimony of Staff Witness Benna, but as we will later discuss, he did not really address the issue. We thus reverse the Commission's determination and approve the settlement agreement regarding the advances made during the period covered by Order 465.

Regarding the Order 499 advances we also think that the Commission imposed an unreasonably harsh standard. Admittedly, that order did impose some timing requirement, but we agree with the Seventh Circuit that this relatively vague guideline[26] did not constitute sufficient notice[27] to the pipelines that they must make all advances on a 30-day installment basis.[28] In response to the Commission's insistence that it has not applied the 30-day "presumption" as a rigid rule, we point out that since its initial application in Opinion 769,[29] the Commission has imposed 30 days as the standard of reasonableness in every advance payments rate proceeding.[30]

In justifying its application of presumptive invalidity in this case the FERC relied heavily on the testimony of staff witness Benna, who stated that from his two years experience working as an Engineer-Mechanical with Shell Oil Co., he had deter-mined that most producers had to pay their bills within 30 days. Based on this information, he had concluded that 30-day installment advances would provide sufficient leeway to allow producers to finance exploration or development of new gas supplies.

There are a number of reasons why we conclude that this testimony carries little weight and is inadequate to support the Commission's holding. First, as United points out, Benna was not involved in Shell's accounting or financial departments. In testifying simply that producers paid current bills in thirty days, he failed to deal with the fiscal requirements of producers in undertaking the often substantial advance-commitment obligations. Even had Order 499's test[31] been the Commission's stated policy throughout the program, this reasoning—unaccompanied by other more persuasive evidence—could not have justified FERC's now disallowing front-end advances.

Second, the witness did not know or attempt to evaluate what costs other than the payment of current bills were incurred or accrued by each of the producers—some of which had limited financial resources—in participating as integral parts of a program of such magnitude. Indeed he as much admitted that he lacked such knowledge in

---

**26.** Again, we emphasize that this guideline appears vague in relation to other much more specific provisions in the advance payment orders.

**27.** The Commission must offer guidelines of sufficient clarity and specificity that pipelines may reasonably determine whether they may properly incur certain costs. *See FPC v. Texaco,* 1974, 417 U.S. 380, 393, 395–96, 94 S.Ct. 2315, 41 L.Ed.2d 141.

**28.** *Natural Gas Pipeline Co. v. FERC, supra,* 590 F.2d at 669. In this case the Seventh Circuit reversed Commission orders denying rate base treatment for Order 499 advances. Finding the 30-day rule impermissibly retroactive, it remanded the proceedings to the Commission for further consideration.

**29.** *See* note 18, *supra.*

**30.** *Tennessee Gas Pipeline Co.,* Opinion Nos. 769 and 769–A, *supra, appeal pending,* No. 77–1496 (D.C. Cir., filed June 2, 1977); *Michigan Wisconsin Pipe Line Co.,* Docket No. RP 73–

102 (July 6, 1977); *Texas Eastern Transmission Corp.,* Docket No. RP 75–73 (June 6, 1977); *Michigan Wisconsin Pipe Line Co.,* Docket No. CP 70–22 (June 3, 1977 and August 1, 1977), No. 77–1719 (D.C. Cir.); *Truckline Gas Co.,* Docket Nos. RP 72–23, *et al.,* (June 3, 1957); *Truckline Gas Co.,* Docket Nos. RP 72–23, *et al.,* RP 73–35 (June 3, 1977); *Natural Gas Pipeline Co. of America,* Docket No. RP 73–110 (June 3, 1977 and August 1, 1977), *reversed, Natural Gas Pipeline Co. v. FERC, supra; Transcontinental Gas Pipe Line Corp.,* Opinion Nos. 801–A (May 31, 1977 and July 29, 1977), *appeal pending,* No. 77–1712 (D.C. Cir.).

**31.** *See* 50 FPC at 2115, in which the Commission states that it will not consider as "reasonable and appropriate" any advances that are "in excess of costs for exploration, development and production incurred by the producers within a reasonable time from the date such amounts advanced are included in the pipeline's rate base."

his admission that, in his studies of seven typical advance payment projects,[32] less than five percent, if that many, of the advances were made in the manner in which he proposed. This testimony, standing essentially alone, does not support the Commission's action regarding United's Order 465 or 499 advances.

The Supreme Court's opinion in *NLRB v. Bell Aerospace*, 1974, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134, does not aid the Commission's defense of its Orders 815 and 815–A. The Opinion does support allowance of agency discretion:

> [it is] plain that the Board is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion.

*Id.* at 294, 94 S.Ct. at 1771. It indicates, however, that some limits govern that discretion:

> The possible reliance of industry on the Board's past decisions with respect to buyers does not require a different result. It has not been shown that the adverse consequences ensuing from such reliance are so substantial that the Board should be precluded from reconsidering the issue in an adjudicative proceedings. Furthermore, this is not a case in which some new liability is sought to be imposed on individuals for past actions which were

taken in good-faith reliance on Board pronouncements.

*Id.* at 295, 94 S.Ct. at 1772.

We think that the Commission's action in Orders 815 and 815–A falls within the exception contemplated in *Bell Aerospace.* Clearly, if the orders stand, United and other pipeline companies will incur substantial unrecoverable costs in reliance on past Commission decisions.[33] We cannot help but think that the resulting enormous yearly losses would hinder the Commission's very purpose for instituting the program.[34]

Having found that the Commission acted unreasonably in applying a 30-day reasonableness standard to United's Order 499 advances, we reverse the Commission's orders as they relate to those payments and remand for further Commission action consistent with this opinion.

### *The Curtain Falls: Conclusion*

We fully recognize the Commission's duty to protect consumers from excessive natural gas prices and more importantly, the obligation of the Commission to consider in rate fixing the continuation of an adequate supply to meet consumer's demands, both now and in the future. We also realize, however, that the pipelines are bound to provide adequate service to their customers. When the companies, with Commission blessing, have acted reasonably in incurring certain costs to obtain gas supplies, the customers will have to pay. The alternative is no gas service. The Supreme Court

---

**32.** *See* R. at 208. Benna had examined advance payments made in the matters of Natural Gas Pipeline Company of America, Docket Nos. RP 72–132 and RP 73–110, Columbia Gas Transmission Corp., Docket No. RP 73–86, Tennessee Gas Pipeline Co., a Division of Tenneco, Inc., Docket No. RP 73–113, Cities Service Gas Company, Docket No. RP 74–4, McCulloch Interstate Gas Company, Docket No. RP 73–103, Kansas-Nebraska Natural Gas Company, Docket No. RP 74–11 and Truckline Gas Company, Docket Nos. RP 72–23, *et al.*, and RP 73–35.

**33.** Counsel for United informed us at oral argument that the costs of carrying the $23,380,650 of outstanding advances for the period in question (about one year) will amount to about 3 million dollars.

**34.** The Commission made it clear in its advance payment orders that maintenance of adequate service—more than *merely* regulation of costs—was a major concern of the program. *See* note 6, *supra*. *See also New York Comm'n I, supra* 151 U.S.App.D.C. at 316, 467 F.2d at 370: "In rate-making under the Natural Gas Act, the intent of Congress was that gas should be sold at the lowest possible reasonable rate *consistent with the maintenance of adequate service in the public interest*." (Emphasis added). (Citing *Cincinnati Gas & Electric Co. v. FPC*, 6 Cir., 1968, 389 F.2d 272, 276; *Atlantic Refining Co. v. FPC*, 1963, 115 U.S.App.D.C. 26, 316 F.2d 677, 678; *Lynchburg Gas Pipeline Co. v. FPC*, 1964, 119 U.S.App.D.C. 23, 336 F.2d 942 (concurring opinion)).

recognized the pipelines' dilemma in *FPC v. Texaco*, noted *supra* 417 U.S. at 393, 94 S.Ct. 2315, when it expressed concern that, in the absence of proper Commission guidance, pipelines would risk incurring unrefundable (from producers) expenses that might later be disallowed (in rate base). Indeed the Commission has already approved producer profits from the advances at issue here, thus precluding refund actions. Opinion Nos. 770 and 770–A,[35] *aff'd, American Public Gas Ass'n v. FPC*, 1977, 186 U.S.App.D.C. 23, 567 F.2d 1016,[36] *cert. denied*, 1978, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 49.

The District of Columbia Circuit declared the advance payment program unsuccessful and refused to transfer the burden of its "scattered uneven impact" to producers who had received advance payments before November 5, 1976.[37] Similarly, we will not allow the Commission to force United to bear the brunt of the Commission's bankrupt program. We reverse as to the 465 advances, reverse and remand as to the 499 advances.

REVERSED IN PART; REVERSED AND REMANDED IN PART.

---

**35.** These orders were issued on July 27, 1976, and November 5, 1976, respectively.

**36.** The Commission had held that a producer who accepted an advance payment after November 5, 1976, (pursuant to a preexisting contract) would be required to make rate adjustments reflective of the lower cost of capital. No such requirement was imposed on producer acceptance of advances before that date.

**37.** *American Public Gas Ass'n*, 186 U.S.App. D.C. at 62–64, 567 F.2d *supra* at 1055–57.