3 F.3d 1544
 303 U.S.App.D.C. 260
 WILLIAMS NATURAL GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Missouri & Kansas Public Service Division Utilicorp United,
Inc., Public Service Commission of the State of Missouri,
State Corporation Commission of the State of Kansas, the
Kansas Power & Light Company, Midwest Gas Users Association,
Intervenors.
 Nos. 90-1545, 91-1543.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 9, 1993.
Decided Sept. 21, 1993.
 
 [303 U.S.App.D.C. 261] Petitions for Review of an Order of the Federal Energy Regulatory Commission.
 Douglas O. Waikart, Washington, DC, argued the cause for petitioner. With him on the brief were Gregory Grady, Washington, DC, Lewis A. Posekany, Jr., and William J. Sears, Tulsa, OK. Robert G. Kern, Washington, DC, and J. Diana Hall, Tulsa, OK, also entered appearances for petitioner.
 Samuel Soopper, Attorney, F.E.R.C. ("FERC"), Washington, DC, argued the cause for respondent. With him on the brief were William S. Scherman, General Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Solicitor, FERC, Washington, DC. Katherine Waldbauer, Attorney, FERC, Washington, DC, also entered an appearance for respondent.
 
 
 1
 Charles V. Garcia, Albuquerque, NM, and Frank A. Caro, Jr., Kansas City, MO, entered appearances for intervenor State Corporation Commission of the State of Kansas in No. 90-1545.
 
 
 2
 Jeffrey A. Keevil, Jefferson City, MO, entered an appearance for intervenor Public Service Com'n of the State of Missouri in No. 90-1545.
 
 
 3
 William I. Harkaway and Steven J. Kalish, Washington, DC, entered appearances for intervenor [303 U.S.App.D.C. 262] Missouri Public Service Div., etc., in No. 90-1545.
 
 
 4
 Martin J. Bregman and John K. Rosenberg, Topeka, KS, entered appearances for intervenor Kansas Power & Light Co.
 
 
 5
 Stuart W. Conrad, Kansas City, MO, entered an appearance for intervenor Midwest Gas Users Ass'n in No. 90-1545.
 
 
 6
 Before EDWARDS, SILBERMAN, and BUCKLEY, Circuit Judges.
 
 
 7
 Opinion for the court filed by Circuit Judge BUCKLEY.
 
 BUCKLEY, Circuit Judge:
 
 8
 In late 1988 and early 1989, Williams Natural Gas Company, a pipeline, paid $18.7 million to its suppliers under four separate settlement agreements. Williams sought to obtain full recovery of these costs by including them in its purchased gas adjustment ("PGA") filings. The Federal Energy Regulatory Commission determined, however, that two of the settlements included amounts paid to buy out Williams's take-or-pay liabilities, and hence that the $9.4 million in costs attributable to these settlements could not be recovered through the PGA mechanism. Williams now challenges the Commission's ruling on a number of grounds. We hold that FERC properly interpreted the disputed settlements as including both purchased gas and take-or-pay buyout costs, that FERC's policy of denying PGA recovery for the full amount of such settlements when the contract does not specifically state the portion allocable to purchased gas is consistent with section 601(c) of the Natural Gas Policy Act and Commission precedent, and that FERC's policy may be applied retroactively to Williams's settlements. Accordingly, we deny the petitions for review.
 
 I. BACKGROUND
 A. Legal Framework
 
 9
 At the core of the present dispute is the difference between two mechanisms through which natural gas pipelines may recover their costs: the PGA procedure and Order No. 500.
 
 
 10
 The Federal Power Commission ("FPC"), FERC's predecessor, devised the PGA procedure in 1972 "to reduce the administrative burdens of dealing with rapid fluctuations in the prices that natural gas producers were charging pipelines." Laclede Gas Co. v. FERC, 997 F.2d 936, 938 (D.C.Cir.1993); see Purchased Gas Cost Adjustment Provision in Natural Gas Pipeline Companies' FPC Gas Tariffs, 47 F.P.C. 1049 (1972). It enables pipelines to alter the rates they charge their customers without having to undergo a full rate proceeding under section 4 of the Natural Gas Act ("NGA"), 15 U.S.C. Sec. 717c (1988). If a PGA clause is included in a pipeline's tariff, the pipeline must document its purchased gas costs in periodic filings with the Commission. Any changes in these costs may then be passed along in the form of higher or lower rates. For purposes of the present case, the critical fact about the PGA procedure is that it enables pipelines to obtain full (i.e., 100 percent) recovery of their purchased gas costs.
 
 
 11
 Order No. 500 was designed to address a different problem. Specifically, it is common for contracts between pipelines and natural gas producers to contain take-or-pay clauses. These require the pipeline to take a designated amount of gas at a specified price, or pay for the gas (or a specified percentage thereof) even if it elects not to take the full amount. Due in part to FERC's encouragement, many pipelines were locked into long-term, high-price gas purchase contracts including take-or-pay provisions in the early 1980s when the price of gas declined dramatically. See Associated Gas Distribs. v. FERC, 824 F.2d 981, 995-96, 1021 (D.C.Cir.1987). Accordingly, the pipelines sought to "buy out" or "buy down" their take-or-pay liabilities by entering into settlement agreements with their suppliers. Under Order No. 500's "equitable sharing mechanism," pipelines may pass these take-or-pay buyout costs along to their customers, but only if they agree to absorb between 25 and 50 percent of the costs. See Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 52 Fed.Reg. 30,334, 30,338, 30,341 (Aug. 14, 1987); see also Public Utilities Comm'n of Cal. v. FERC, 988 F.2d 154, 157[303 U.S.App.D.C. 263] 58 (D.C.Cir.1993); Associated Gas Distribs. v. FERC, 893 F.2d 349, 353 (D.C.Cir.1989).
 
 
 12
 The fact that there are two distinct cost recovery mechanisms can create classification problems for certain types of settlement payments. It is clear that settlement payments relating solely to take-or-pay liabilities must be recovered under Order No. 500, see Regulatory Treatment of Payments Made in Lieu of Take-or-Pay Obligations, 50 Fed.Reg. 16,076, 16,077 (Apr. 24, 1985) (declaring that take-or-pay buyout payments do not qualify as the type of "purchased gas costs" that may be recovered under the PGA regulations), while payments that are exclusively intended to settle disputes over the price of gas already taken are eligible for PGA recovery, see Columbia Gas Transmission Corp., 30 F.E.R.C. p 61,224, at 61,444 (1985).
 
 
 13
 Difficulties arise, however, in cases involving broader settlements that resolve disputes over both take-or-pay liabilities and purchased gas pricing issues. The Commission first addressed the issue of such "comprehensive" settlements in a series of decisions issued in 1989, one of which involved Williams. These decisions made clear that "[a]ll one-time, nonrecoupable costs to reform or terminate producer-supplier problem contracts that include, but are not necessarily limited to, the modification or elimination of take-or-pay provisions are eligible for passthrough under the procedures established by Order No. 500." El Paso Natural Gas Co., 47 F.E.R.C. p 61,149, at 61,460 (1989); see also Williams Natural Gas Co., 47 F.E.R.C. p 61,155, at 61,504 (1989).
 
 
 14
 The Commission's 1989 rulings left open the question whether comprehensive settlement payments, or at least the portion relating specifically to purchased gas pricing issues, could be included in a pipeline's PGA filings. A year later, however, the Commission did address that issue in ANR Pipeline Co., 50 F.E.R.C. p 61,372 (1990). In ANR, the Commission permitted a pipeline to include in its PGA filings an amount that was paid in a comprehensive settlement, but which was "separately identified" in the contract as being intended to settle a pricing dispute concerning gas already taken. See id. at 62,125. FERC cautioned, however, that it would not permit PGA passthrough in cases in which the amount paid for purchased gas was not separately stated; instead, "the costs of settling pricing disputes in such contexts are recoverable exclusively through Order No. 500 filings." Id. The Commission reasoned that, when the amounts are not identified on the face of the contract, "it is not possible to distinguish reliably between the costs of settling pricing disputes and the costs of settling take-or-pay liabilities or reforming contracts." Id. We will refer to the principle announced in this decision as the "ANR rule."
 
 B. The Facts
 
 15
 In December 1988 and January 1989, Williams executed four separate settlement agreements under which it paid its suppliers a total of $18.7 million. After a series of preliminary disputes that are not relevant here, Williams amended its March 1, 1990, PGA filing to include the payments made under the settlement agreements as purchased gas costs. Williams asserted that inclusion of the settlement costs in the PGA filings was consistent with ANR because it was clear from the language of the contracts that the payments were intended exclusively to resolve gas pricing disputes.
 
 
 16
 In response to Williams's filing, Kansas Power and Light Company intervened, along with the Kansas Corporation Commission, the Missouri Public Service Commission, and several other entities (collectively, the "intervenors"). The intervenors maintained that the settlement payments included amounts paid to buy out take-or-pay liabilities, and that the contracts did not on their face specify what portion of the total payments was intended to resolve gas pricing disputes. As a result, they argued that Williams was barred by ANR from including the settlement payments in its PGA.
 
 
 17
 On May 30, 1990, FERC rendered an initial decision in which it determined that Williams was entitled to recover all but $3.2 million of the settlement payments through its PGA filings. Williams Natural Gas Co., 51 F.E.R.C. p 61,244, at 61,678 (1990). According to the Commission, PGA recovery was appropriate for three of the four settlement [303 U.S.App.D.C. 264] payments, as these settlements were intended solely to resolve disputes over the price of gas already taken. See id. FERC found, however, that the remaining settlement "indicates only that the payment was in consideration of settling 'litigation' between the parties with no indication that the litigation was limited to a pricing dispute." Id. Thus, the $3.2 million payment arising from that settlement was "ineligible for PGA recovery." Id.
 
 
 18
 Williams sought rehearing of FERC's order insofar as it denied PGA passthrough for the $3.2 million settlement payment. Along with its rehearing request, Williams submitted documents from the litigation that had given rise to the settlement in an attempt to support its position that the payment was intended solely to settle a pricing dispute. At the same time, the intervenors also requested rehearing, arguing that FERC had erred by allowing PGA recovery for the other three settlements.
 
 
 19
 On September 18, 1990, FERC issued an order denying Williams's rehearing request and granting in part the rehearing request of the intervenors. See Williams Natural Gas Co., 52 F.E.R.C. p 61,275 (1990). As an initial matter, the Commission determined that it was appropriate to consider the litigation papers proffered by Williams, notwithstanding the suggestion in ANR that FERC would examine only the language of the settlement document itself. See id. at 62,076-77. In reaching this conclusion, FERC relied on a decision issued concurrently in Transwestern Pipeline Co., 52 F.E.R.C. p 61,274 (1990). In Transwestern, the Commission found that ANR did bar a pipeline from presenting extrinsic evidence to show that an unstated fraction of a single, overall settlement amount was intended to settle a pricing dispute over purchased gas. Id. at 62,061. It nevertheless held that extrinsic materials could be introduced "to show that a separate amount, which is actually set forth in the settlement although not expressly identified as related to a pricing dispute, was in fact intended as a payment to settle a pricing dispute." Id.
 
 
 20
 From Williams's perspective, the Commission's decision to review the litigation papers proved to be something of a pyrrhic victory. After examining these documents, the Commission determined that the $3.2 million settlement payment was intended to "settle more than pricing disputes for gas already taken." Accordingly, the Commission reaffirmed its stance that this amount was ineligible for PGA recovery. Moreover, FERC reversed its position with respect to one of the remaining settlements, under which Williams had paid $6.2 million. Upon reexamination, the Commission determined that the language of that settlement was ambiguous. It then turned to the litigation papers and found that at least a portion of the $6.2 million did not relate to pricing disputes, thereby leading to the conclusion that the entire amount would have to be recovered under Order No. 500.
 
 
 21
 Williams subsequently requested further rehearing of the rulings in the September 18, 1990 order. On September 19, 1991, however, FERC denied the rehearing request. See Williams Natural Gas Co., 56 F.E.R.C. p 61,410 (1991). In its "Order Denying Rehearing," FERC maintained that it had correctly interpreted the settlement agreements when it concluded that at least some portion of the disputed settlement amounts was attributable to take-or-pay liabilities. See id. at 62,481-82. According to FERC, "there is no doubt that Williams received significant relief with respect to future obligations over an extended period of time" in those contracts for which PGA recovery was denied. Id. at 62,482.
 
 
 22
 FERC next rejected Williams's argument that its initial rehearing order was inconsistent with section 601(c) of the NGPA. Section 601(c) applies to first sales (i.e., sales at the wellhead) of gas, and provides that "the Commission may not deny any interstate pipeline recovery of any amount paid with respect to any purchase of natural gas" if the price does not exceed the statutory maximum, "except to the extent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." 15 U.S.C. Sec. 3431(c)(2). According to FERC, findings of fraud or abuse were not required because Williams had "not shown that the total settlement dollars ($9.4 million) agreed [303 U.S.App.D.C. 265] upon with the producers and set forth in the settlements relate solely to pricing disputes for gas already taken and therefore to first sales of gas." Williams, 56 F.E.R.C. p 61,410, at 62,482.
 
 
 23
 Finally, FERC rejected Williams's claims that the ANR rule was irrational because "one dollar ... paid in settlement of non-pricing disputes would ... completely disqualify from PGA treatment ... the $9.4 million," that the rule was inconsistent with prior Commission precedents, and that it was unfairly applied on a retroactive basis to Williams's settlements. See id. at 62,482-83. Responding to these arguments, the Commission determined that the ANR rule rationally reflected the difficulty of using extrinsic evidence to determine the precise portion of a lump-sum amount that was paid to resolve pricing disputes; that the Commission precedents cited by Williams were distinguishable, and hence not inconsistent with ANR; and that although the policy was announced after Williams had entered its settlements, retroactive application was justified because "it is not unusual for the Commission to resolve new issues involving past events." See id.
 
 II. DISCUSSION
 
 24
 A. FERC's Interpretation of the Settlement Agreements
 
 1. Standard of Review
 
 25
 Williams contends that we should apply de novo review to FERC's interpretation of the settlement agreements because (1) the Commission employed ordinary rules of contract construction rather than relying on its expertise in the energy regulation field, (2) the settlement agreements did not require Commission approval, and (3) the Commission's interpretation of one of the settlements has vacillated. We find, however, that FERC's interpretation of the contracts is entitled to deference under the principles articulated in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 26
 Williams's claim that deference would be inappropriate because FERC employed "general principles of contract construction" in interpreting the settlements is grounded on the Supreme Court's decision in Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960). In that case, the Court held that no deference was due to the FPC's construction of a contract for the sale of natural gas because "the record nowhere discloses that the Commission arrived at its interpretation ... on the basis of specialized knowledge gained from experience in the regulation of the natural gas business." Id. at 268, 80 S.Ct. at 1126.
 
 
 27
 Unfortunately for Williams, we squarely held, in National Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563 (D.C.Cir.1987), that the Texas Gas rule does not survive the Supreme Court's Chevron decision. See id. at 1570. In National Fuel, FERC relied on its interpretation of a settlement agreement to deny a request for a retroactive increase in natural gas rates. See id. at 1566. Based on a lengthy discussion of the standard of review, see id. at 1568-72, we determined that "the correct view requires a court to give deference to an agency's reading of a settlement agreement even where the issue simply involves the proper construction of language." Id. at 1569 (emphasis added). We reasoned that Congress had explicitly delegated to FERC "a broad range of adjudicative powers over natural gas rates," id., and that Chevron 's emphasis on deference to an agency's "special competence" when there has been such a delegation "implicitly modified earlier cases that adhered to the traditional rule of withholding deference on questions of contract interpretation." Id. at 1570 (citing Texas Gas as an example of a case "adher[ing] to the traditional rule"). Subsequent cases have reaffirmed the National Fuel holding that review of FERC's contract interpretation rulings is to be conducted under Chevron. See, e.g., Tarpon Transmission Co. v. FERC, 860 F.2d 439, 441 (D.C.Cir.1988) (stating that although the interpretation of a rate adjustment provision in a gas transportation agreement "is a matter of contract law, we nonetheless owe deference to the Commission's view").
 
 
 28
 Williams's next argument attempts to distinguish the present case from National Fuel [303 U.S.App.D.C. 266] and its progeny on the ground that the settlements were purely private agreements that did not require Commission approval before going into effect. For support, Williams points to Cajun Electric Power Cooperative, Inc. v. FERC, 924 F.2d 1132 (D.C.Cir.1991), in which we commented that "[p]erhaps [the] most important" reason to apply deferential review to FERC's interpretation of a settlement agreement was that the agreement "had to be approved by FERC" so that "it was a good deal more than just an agreement between private parties and was rather more closely akin to an order of the Commission." Id. at 1135; see also id. at 1135 n. 4. Williams also observes that the court in National Fuel cited FERC's role in approving the settlement at issue as "[a] further reason ... to defer to the Commission's reading of th[e] agreement." National Fuel, 811 F.2d at 1571.
 
 
 29
 Notwithstanding this language in Cajun Electric and National Fuel, Williams's argument based on the "purely private" status of its settlements is ultimately unconvincing. In particular, while the National Fuel court did mention FERC approval as "[a] further reason" to support its holding that courts must defer to the Commission's contract interpretations, see id., it emphasized that "Chevron principles alone compel this conclusion." Id. at 1570. More to the point, in the recent case of Transwestern Pipeline Co. v. FERC, 988 F.2d 169 (D.C.Cir.1993), we held that even if a contract is not filed with or approved by the Commission, FERC's reading is entitled to deference where, as here, the interpretation is intended for "a limited regulatory purpose ... and not to determine the parties' ultimate contractual rights and responsibilities." Id. at 173.
 
 
 30
 Williams's final argument applies only to FERC's interpretation of the $6.2 million settlement agreement. Williams observes that the Commission initially found, based on the plain language of the agreement, that it was intended solely to settle purchased gas pricing disputes. The Commission later reversed its position, finding the terms of the agreement ambiguous and holding that the extrinsic evidence indicated that the agreement was in fact intended to settle take-or-pay issues as well as disputes over the price of gas already taken. Williams argues that this "vacillation in the interpretation of ... the settlement[ ] ... makes deference inappropriate." Reply Brief for Petitioner at 9.
 
 
 31
 Williams's "vacillation" argument attempts to stride through a door consciously left open by National Fuel, in which we remarked that "[i]f the agency's interpretation of a contract has vacillated, deference might give the agency license to act arbitrarily by making inconsistent decisions without justification." National Fuel, 811 F.2d at 1571. As an example of such a case, we cited Tennessee Gas Transmission Co. v. FERC, 789 F.2d 61 (D.C.Cir.1986). See National Fuel, 811 F.2d at 1571. In Tennessee Gas, we declined to defer to FERC's interpretation of a stipulation between itself and a private party on the ground that the Commission had presented three different rationales at various times to support that interpretation. We explained:
 
 
 32
 We think it inappropriate to defer to FERC's interpretation ... because the Commission has vacillated in articulating a rationale for its result. FERC's first order relied on a concededly mistaken construction by the Commission of one of its own regulations; its clarifying order relied on Articles II and III "read together"; and on appeal, FERC's counsel relied on the "plain meaning" of Article III. This removes the usual presumption of deference that attends administrative decisions made in the exercise of the agency's delegated authority. FERC's handling of the case demonstrates tenacious dedication to a particular result ... but does not constitute the kind of reasoned decision-making to which we will defer.
 
 
 33
 Tennessee Gas, 789 F.2d at 62-63 (footnote and citations omitted).
 
 
 34
 In National Fuel, we did no more than suggest a "vacillation" exception. But, even if we were to adopt one, FERC's change of position with respect to the $6.2 million settlement would not fall within it. Indeed, this case is readily distinguished from Tennessee Gas. Here, FERC did not demonstrate a "tenacious dedication to a particular result," id. at 63; rather, it simply reexamined the $6.2 million settlement agreement on rehearing [303 U.S.App.D.C. 267] in light of the objections raised by the intervenors and arrived at a different result. Moreover, to hold that such a one-time change of position results in the loss of the Commission's entitlement to deference under Chevron seems inconsistent with the requirement that aggrieved parties present their objections in a rehearing petition before seeking judicial review. See 15 U.S.C. Sec. 3416(a)(2); see also id. Sec. 717r. The purpose of this requirement is to ensure that errors will be brought to FERC's attention and to provide the Commission with an opportunity to rectify them. This purpose would be undermined if FERC was, in effect, penalized for correcting its mistakes.
 
 
 35
 Accordingly, we conclude that FERC's interpretation of the settlement agreements is properly reviewed under the principles enunciated in Chevron. We have adapted the Chevron principles to the interpretation of contracts by requiring that we first review de novo the question whether the settlement agreements are ambiguous. See Cajun Elec. Power Coop., 924 F.2d at 1136. If such ambiguity exists, we must defer to the Commission's construction "so long as it is reasonable." Id. at 1137; see also Natural Gas Clearinghouse v. F.E.R.C., 965 F.2d 1066, 1070 (D.C.Cir.1992) (noting that FERC's "interpretation of a technical contract provision" must reflect "reasoned and principled decisionmaking that can be ascertained from the record") (quoting Tarpon, 860 F.2d at 442).
 
 2. The Merits
 
 36
 The settlement agreements and the relevant extrinsic evidence were submitted under seal. We have carefully reviewed these materials in accordance with the standard set forth above and conclude that the Commission's interpretation should be upheld.
 
 B. The ANR Rule
 
 37
 Williams asserts two basic arguments against the ANR rule, which denies PGA recovery for the full amount of a comprehensive settlement payment if the settlement agreement fails to state specifically the portion allocable to disputes over the price of gas already taken. First, Williams contends that the ANR rule contravenes section 601(c) of the NGPA because it may result in the denial of full passthrough for costs incurred in first sales of natural gas. Second, Williams claims that ANR represents a sharp and inadequately explained departure from Commission precedent.
 
 1. Section 601(c)
 
 38
 Williams stresses that section 601(c) provides for the "[g]uaranteed passthrough" of "any amount paid" with respect to a first sale of natural gas. 15 U.S.C. Sec. 3431(c). The only restrictions are that the price passed through may not exceed the statutory maximum, and that a passthrough may be disallowed "to the extent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." Id. Sec. 3431(c)(2); see Office of the Consumers' Council v. FERC, 914 F.2d 290, 292 (D.C.Cir.1990). Williams asserts that the ANR rule is inconsistent with section 601(c) because it necessarily results in the denial of full passthrough of costs incurred in first sales without the requisite finding that the price paid was excessive for one of the reasons stated in that section. For example, in the present case, the Commission acknowledges that at least a portion of the settlement amounts was paid to resolve purchased gas pricing disputes. Moreover, the Commission has recognized that "[p]ayments to settle pricing disputes concerning gas actually taken are payments made in first sales." Transwestern, 52 F.E.R.C. p 61,274, at 62,062. Nevertheless, the Commission applied ANR to deny recovery of the full amount of the settlement payments on the ground that the contracts did not specifically state the amount allocable to purchased gas.
 
 
 39
 Although the issue is close, we find that the ANR rule does not contravene section 601(c). The absolute right of pass-through conferred by section 601(c) extends only to "amount[s] paid in any sale of natural gas." 15 U.S.C. Sec. 3431(c)(2). Accordingly, if a pipeline is unable to demonstrate that a particular expenditure represents such an "amount paid," it has no statutory entitlement to recover that expenditure from its customers. Moreover, FERC's responsibility to administer and enforce the NGPA, see [303 U.S.App.D.C. 268] 15 U.S.C. Secs. 3411, 3414, implies a power to develop procedural and evidentiary standards to govern the process of ascertaining what are and are not gas costs. Cf. Wagner & Brown v. ANR Pipeline Co., 837 F.2d 199, 203 (5th Cir.1988) (holding that FERC's power under the NGPA to seek injunctions against sales of gas above applicable price ceilings, see 15 U.S.C. Sec. 3414, implied the "authority to determine which payments required under producer-pipeline contracts will be included in the 'price' of natural gas"). These standards must be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A); see 15 U.S.C. Sec. 3412(a) (providing that rules and orders promulgated by FERC in implementing the NGPA are to be reviewed under the provisions of the Administrative Procedure Act).
 
 
 40
 In the case of the ANR rule, we find no abuse of the Commission's discretion. The rule is founded on the eminently sensible concern that, as a general matter, it is not possible to reliably divide lump-sum settlement payments into their component parts, and that even if this might be possible in some cases, the administrative costs of doing so would be excessive. Furthermore, there is no reason to believe that the ANR rule imposes undue hardship on natural gas pipelines. Requiring that comprehensive settlement agreements identify on their face the amount allocable to the resolution of pricing disputes is no more difficult than, say, asking pipelines to obtain itemized bills from their suppliers to document the types and amounts of their expenditures. Indeed, at the close of oral argument, Williams's counsel admitted that if the ANR rule were adopted in a rulemaking for purely prospective effect and a pipeline subsequently failed to make the required allocation of costs in a settlement agreement, the rule could be enforced to deny full passthrough of the settlement costs without violating section 601(c). This admission suggests that the crux of Williams's problem with the ANR rule is the retroactive manner in which it was applied, an issue we address below, rather than any inherent conflict with section 601(c).
 
 2. Consistency with FERC Precedent
 
 41
 Williams next argues that the ANR rule represents a break with Commission precedents permitting PGA recovery of payments including both purchased gas and take-or-pay buyout costs. In particular, Williams relies on Williston Basin Interstate Pipeline Co., 48 F.E.R.C. p 61,229 (1989). Like Williams, the pipeline in Williston was locked into long-term, high-price gas purchase contracts with take-or-pay clauses. To induce its suppliers to renegotiate the contracts, the pipeline offered to make "incentive payments"; that is, it would pay additional amounts for gas it purchased in 1985 and 1986 if its suppliers agreed to amend the contracts to market price levels and relinquish all outstanding claims, including take-or-pay claims. The amount of the incentive payments was largely contingent on the actual quantity of gas purchased by the pipeline. FERC ruled that such incentive payments were eligible for recovery through the pipeline's PGA filings. See id. at 61,812-13.
 
 
 42
 In addition to Williston, Williams points to several other cases in which FERC permitted costs that compensated suppliers for the release of take-or-pay obligations to be recovered through the PGA mechanism. Specifically, in Transcontinental Gas Pipe Line Corp., 43 F.E.R.C. p 61,568 (1988), the Commission authorized PGA passthrough for a pipeline's "annual revenue obligation," which replaced the take-or-pay provisions in that pipeline's gas purchase contracts. Id. at 62,398. This obligation required the pipeline to pay higher prices when it took less than the take-or-pay level of gas. See id. at 62,397; see also Tennessee Gas Pipeline Co., 42 F.E.R.C. p 61,368, at 62,076 (1988) (holding that a similar "producer inventory charge" could be recovered as a purchased gas cost), reh'g denied, 43 F.E.R.C. p 61,373 (1988). Similarly, in Colorado Interstate Gas Co., 41 F.E.R.C. p 61,179 (1987), FERC allowed a pipeline to include in its PGA high per-unit gas costs that, in part, compensated suppliers for a waiver of take-or-pay obligations. See id. at 61,464.
 
 
 43
 While the cases cited by Williams did permit PGA recovery of what were, in effect, take-or-pay buyout costs, these decisions are [303 U.S.App.D.C. 269] not fundamentally inconsistent with ANR. The cited cases reflect a purely formal rule under which expenditures, even those to buy out take-or-pay obligations, could be recovered through a pipeline's PGA filings as long as they are incorporated in the price of the gas held for or delivered to the pipeline, thus permitting the amounts paid to be construed as "gas costs." By contrast, ANR and the present case involve a different problem: settlements that call for fixed, one-time, lump-sum payments in which the amount paid to buy out take-or-pay liabilities is not tied to actual gas purchases. Significantly, the Commission itself drew this distinction in Williston by emphasizing that PGA recovery of the incentive payments was appropriate because "[a]ll incentive payments remained contingent upon gas actually purchased and in no case were payments, including lump-sum payments, made, regardless of gas purchased, for settlement of [take-or-pay] claims." Williston, 48 F.E.R.C. p 61,229, at 61,812; see also id. at 61,813 (noting that "the payment of the incentive portion of the price was contingent upon [the pipeline's] unilateral decision to purchase gas from a particular producer in the first place"). Moreover, the Commission in Williston denied PGA recovery for incentive payments made under certain contracts that imposed an "obligation to make the incentive payments ... even if [the pipeline] took no gas...." Id. at 61,811; see id. at 61,813.
 
 
 44
 Williams claims that FERC's distinction between take-or-pay buyout costs that are incorporated into the price of gas and one-time, lump-sum payments is unsatisfactory because it elevates the form of settlement payments over their substance. In its view, focusing on the manner in which the payments were made should not obscure the fact that the pipelines in Williston, Transcontinental, and Colorado Interstate were able to obtain full PGA recovery of their take-or-pay buyout costs, while Williams must absorb at least 25 percent of its take-or-pay costs under Order No. 500. From a purely economic standpoint, there is merit in this position. Still, this argument has more to do with the rationality of FERC's overall policy than the consistency of ANR with prior Commission cases; and we do not believe that FERC's policy rises to the level of being arbitrary and capricious. First, the line that FERC has drawn, although formal, is both readily administered and consistent with the stated purpose of the PGA procedure, which is to provide a mechanism for the passthrough of purchased gas costs. Moreover, in Williston, FERC offered several tenable reasons for allowing PGA recovery of the full amount of payments incorporated in the price of purchased gas--most notably, the absence of a direct correlation between the amount the pipeline is obligated to pay and the magnitude of the pipeline's take-or-pay exposure. See Williston, 48 F.E.R.C. p 61,229, at 61,812-13. Thus, although we might prefer a rule that more nearly reflects the economic substance of the transactions, FERC's policy is not so lacking in a reasoned foundation that it must be reversed.
 
 C. Retroactivity
 
 45
 Williams's final argument is that the ANR rule was unfairly applied to its settlements on a retroactive basis. According to Williams, it had no reason to expect that FERC would require an explicit apportionment of the component parts of a settlement agreement; and it asserts that if it had known what to expect, it would have obtained the appropriate contract language. FERC responds that because ANR is consistent with prior Commission precedent, there was no unfair surprise and the rule may properly be applied to the settlements.
 
 
 46
 In determining whether a rule announced in an agency adjudication may be given retroactive effect, we have typically considered the five factors set forth initially in Retail, Wholesale & Department Store Union v. NLRB, 466 F.2d 380 (D.C.Cir.1972) ("Retail Union "):
 
 
 47
 (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of the law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in [303 U.S.App.D.C. 270] applying a new rule despite the reliance of a party on the old standard.
 
 
 48
 Id. at 390; see also Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d 1074, 1081 (D.C.Cir.1987) (stating that Retail Union "provides the framework for evaluating retroactive application of rules announced in agency adjudications"). The precise statement of the factors to be considered has, however, varied from case to case. See District Lodge 64, Int'l Ass'n of Machinists & Aerospace Workers v. NLRB, 949 F.2d 441, 447 (D.C.Cir.1991) (considering whether "(1) the decision creates a new rule ... (2) retroactive application will be more likely to hinder than to further the operation of the new rule ... and (3) retroactive application would produce 'substantial inequitable results' ") (citing Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)); Consolidated Freightways v. NLRB, 892 F.2d 1052, 1058 (D.C.Cir.1989) (noting that it was appropriate to examine "such factors as the degree of hardship [the parties] will experience, their justifiable reliance on past practices, and the statutory interest in a retroactive application of the new rule"); Tennessee Gas Pipeline Co. v. FERC, 606 F.2d 1094, 1116 n. 77 (D.C.Cir.1978) ("The relevant factors include the degree of retroactivity, the need for administrative flexibility, and the hardship on the affected parties."); see generally United Food & Commercial Workers Union v. NLRB, 1 F.3d 24, 34-35 (D.C.Cir.1993) ("UFCW ").
 
 
 49
 From our experience in applying the various versions of the Retail Union test, there has emerged "[a] basic distinction ... between (1) new applications of law, clarifications, and additions, and (2) substitution of new law for old law that was reasonably clear." Aliceville Hydro Assocs. v. FERC, 800 F.2d 1147, 1152 (D.C.Cir.1986) (quoting 4 Kenneth C. Davis, Administrative Law Treatise Sec. 20:7, at 23). In the latter situation, which may give rise to questions of fairness, it may be necessary to deny retroactive effect to a rule announced in an agency adjudication in order to protect the settled expectations of those who had relied on the preexisting rule. See id. By contrast, retroactivity in the former case is "natural, normal, and necessary," id., a corollary of an agency's authority to develop policy through case-by-case adjudication rather than rulemaking. See NLRB v. Bell Aerospace, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); UFCW, 1 F.3d at 35. Thus, we have repeatedly held that retroactivity is appropriate when the agency's ruling represents "a new policy for a new situation," rather than being "a departure from a clear prior policy." New England Tel. & Tel. Co. v. FCC, 826 F.2d 1101, 1110 (D.C.Cir.1987); see District Lodge 64, 949 F.2d at 447 (observing that prior agency precedent was "neither clear nor consistent"); Clark-Cowlitz, 826 F.2d at 1081-86 (retroactivity allowable in a case in which FERC's prior policy did not "rise to the level of a well-established practice") (internal quotation marks omitted); Aliceville, 800 F.2d at 1152 (noting that "there was no well-established practice ... but rather an unsettled question of law which the Commission was called upon to decide"); Local 900, Int'l Union of Elec., Radio & Machine Workers v. NLRB, 727 F.2d 1184, 1194-95 (D.C.Cir.1984) (observing that "the new rule cannot be called an abrupt break with a well-settled policy"); cf. Southern California Edison Co. v. FERC, 805 F.2d 1068, 1071 & n. 4 (D.C.Cir.1986) (finding that it was appropriate for FERC to resolve an issue in an adjudication although "no agency precedent expressly addresses this precise issue").
 
 
 50
 The present case falls squarely within our precedents authorizing retroactivity for agency rules that do not represent a shift from "a clear prior policy." As discussed above, FERC simply did not have a policy with respect to PGA recovery of amounts paid in comprehensive, lump-sum settlements prior to ANR. Consequently, the ANR rule may fairly be characterized as "a new rule for a new situation," and that rule may be retroactively applied to Williams's settlements.
 
 
 51
 Our confidence in the conclusion that retroactive application of the ANR rule is appropriate is bolstered by a review of the cases cited by Williams in an attempt to further its cause. In particular, Williams likens this case to United Gas Pipe Line Co. v. FERC, 597 F.2d 581 (5th Cir.1979), and Natural Gas Pipeline Co. v. FERC, 590 F.2d 664 (7th Cir.1979). At issue in those cases [303 U.S.App.D.C. 271] was the administration of a policy under which the FPC encouraged pipelines to make "advance payments," essentially interest free loans, to natural gas producers. Under the FPC program, pipelines were entitled to include the advance payments in their rate base as long as they were "reasonable and appropriate." See United Gas, 597 F.2d at 583. In 1975, however, the FPC adopted the view that "advances spent more than 30 days after inclusion in the rate base ... were 'presumptively extravagant,' " id. at 584, and denied rate base treatment for certain advance payments made by pipelines in 1974 and early 1975. Both the Fifth Circuit and the Seventh Circuit reversed the Commission's action, finding that the FPC's new interpretation was unfairly applied to the pipelines on a retroactive basis. See id. at 588-89; Natural Gas Pipeline Co., 590 F.2d at 669-70.
 
 
 52
 Williams's references to United Gas and Natural Gas Pipeline only serve to weaken its position. In Tennessee Gas Pipeline Co. v. FERC, 606 F.2d 1094 (D.C.Cir.1979), we confronted precisely the same question addressed by the Fifth and Seventh Circuits and came to a different conclusion. Although we did find that the FPC's "30-day rule" was inconsistent with the "experimental" nature of the advance payment program, see id. at 1117-19, we rejected the claim that it was improper for the FPC to have applied that rule retroactively, see id. at 1115-17. In doing so, we emphasized that the rule "d[id] not reverse a policy that had been the subject of reasonable reliance." Id. at 1116; see generally id. at 1115-17 & n. 77 (discussing and rejecting the approach taken by the Seventh Circuit in Natural Gas Pipeline ). Similarly, in the present case, there was no reversal of a prior Commission policy; hence the ANR rule may be retroactively applied.
 
 III. CONCLUSION
 
 53
 For the foregoing reasons, the petitions for review are
 
 
 54
 Denied.